[L. A. No. 19924.  In Bank.  May 21, 1947.]

HAZEL E. McCLELLAND, Petitioner, v. THE BOARD OF SUPERVISORS et al., Respondents.

John W. Preston and John W. Preston, Jr., for Petitioner.

Harold W. Kennedy, County Counsel, and A. Curtis Smith, Deputy County Counsel, for Respondents.

SCHAUER, J.—Petitioner is the owner of a 44-unit apartment house located in the city of Los Angeles. In July, 1946, the Board of Supervisors of Los Angeles County, sitting as a board of equalization, after a hearing denied applications made to it by petitioner and by approximately 700 other owners of multiple-dwelling properties in that county for the reduction of the assessment valuations of their various properties. (See Rev. & Tax. Code, §§ 1601-1615.) Thereafter petitioner, "on behalf of herself and all other taxpayers of the county of Los Angeles . . . of the same class and similarly situated," instituted this certiorari proceeding. It was contended before the board and petitioner contends here that by reason of a 1946 increase in the assessment valuations of multiple-dwelling improvements the tax assessments against such properties were unfair, unjust and excessive, and resulted in unequal and illegally discriminatory tax burdens as compared with the assessments upon other real property in the county. It is urged that upon the established facts the board exceeded its jurisdiction when it denied the applications for equalization. The relief asked of the board, and in ultimate effect through the process of this court, is that the 1946 assessed valuations be reduced to those of 1945.

In support of her position petitioner alleges that in the year 1940, the assessor of Los Angeles County made a general revaluation of all real property improvements in the county and entered such valuations in the 1940 county assessment-roll; that "no general changes in the assessable valuations of said real property improvements were thereafter made" until the taxable year 1946; that in 1946, the assessor "undertook a piecemeal revaluation of buildings but applied it only to certain real properties . . ., to wit: multiple dwelling improvements . . . hotels and in a limited way to special type loft and office buildings; but . . . made no changes in the assessable values of single-family dwelling properties, or, generally speaking, in commercial and industrial property improvements or in vacant lands generally, in said County"; that for the year 1946, the assessed valuation of the improvements on petitioner's property was increased from $40,000 to $54,000

and that of the land remained at the previous figure of $2,450; that as of the taxable year 1946 "the market or selling price of all real property and improvements situated in said County had risen to higher levels in comparison with the market or selling price of said real property and improvements for . . . 1940 to 1945"; that "any prior enhancement in the value of improved property, due to the higher costs of labor and materials, to scarcity or legal restrictions upon the purchase or use of building materials, was general and uniform as to all types of building construction taxable in the said County"; that, therefore, "it was the duty of the Assessor . . . either to increase, readjust and equalize all valuations of real property and improvements in said County for the taxable year 1946-47, or, after taking into consideration the economic effects of controlled and uncontrolled rents, to allow all assessable property values to remain at uniform levels corresponding to the said 1940 revaluation of improvements." It is further alleged that "the method and scheme adopted and followed by said assessor in assessing" multiple-dwelling properties for 1946 were illegal in that:

1. The assessor arbitrarily allocated all alleged increases in the values of multiple-dwelling properties "to the improvements on the respective properties, and no part . . . was allocated to the lands underlying said improvements. That the assessor's said action was taken . . . by him in . . . an effort to obviate the necessity for increasing the value of the land underlying single-family dwellings and vacant lots adjacent thereto" in the county.

2. "That in furtherance of said purpose said assessor refrained designedly from increasing the assessable value of the lands . . . underlying single unit dwellings and vacant lots intermingled with such . . . dwellings, except in a very few areas where . . . special local conditions . . . made it appear incumbent . . . to allocate some increase to [such] . . . lands."

3. That for the taxable year 1946, "there were in the County . . . more than 650,000 single-family dwellings, approximately 180,000 of which were occupied by rent-paying tenants, which brought said dwellings in direct competition with the [multiple-dwelling] properties represented herein by petitioner. But said assessor, acting arbitrarily . . . refrained from making any increase in the value for tax pur-

poses of the . . . [single-unit dwelling] improvements. . . . That the . . . single unit dwellings are as a rule located in the same block or in the immediate vicinity of the properties represented herein by petitioner.''

4. That the block in which petitioner's real property is situated contains a total of eighteen lots; that of such lots one is vacant, two are improved with apartment houses (one of which is petitioner's property here involved), one is improved with a home for children, one with a finance office, two with dwellings used for churches, and the remainder with one-family dwellings; that no increases in the assessed valuations of any of the eighteen lots were made in 1946; that increases in the valuations of improvements upon such lots were made in the following three instances only: The two apartment house improvements were increased 35 per cent and 37 per cent, respectively, over 1945; and the home for children was increased approximately 12½ per cent over 1945.

Petitioner alleges further that on July 29, 1946—the final day of the hearing before the board—an offer was made to prove that the assessor ''had been for some time and was then . . . entering upon the map books of his office increases in assessment valuations of single-family dwelling properties for the year 1947 ranging from 21% to 83%,'' but that the board refused the offer of proof.

Respondents (the board of supervisors and the assessor of Los Angeles County) deny the occurrence of a general increase in either market value or selling price of real property during the taxable years 1940 through 1946, and allege ''that some property had decreased in price and value, some property, including the property of petitioners, had increased both in price and value and that a substantial part of the said property, including most single family dwelling improvements, had increased in price but had not increased in value due to the fact that such increase in price represented a bonus or premium paid by purchasers for shelter and that as of the [taxable year 1946] . . . there was no substantial evidence that such increases in prices represented any increase in market value, and any increases placed on such property . . . would have been speculative.'' They further allege that in determining values both the assessor and the board considered, among other factors, those of costs of labor and materials, the economic effects of controlled and uncontrolled

rents, and the scarcity of and legal restrictions upon the purchase and use of building materials, but take the position that such factors do not in themselves establish value or have a general or uniform effect upon value and that the assessor was under no duty either to increase and readjust all valuations of real property or else to allow all such valuations to remain at the 1945 levels. Respondents allege also that rather than undertaking a piecemeal revaluation of buildings in 1946, the assessor redetermined the value of all property, including improvements, in the county; that he decreased the assessed values of some properties, increased others, and made no changes in others; that substantial increases were made in the valuations of lands in "many . . . large areas in the county and that such changes were made in all . . . instances where in the opinion of the Assessor land values had increased regardless of whether such land was vacant, occupied by single family dwelling units, multiple dwelling units or other types of improvements"; that the increases made were not arbitrary or made in an effort to avoid increasing the valuations of land underlying single family dwellings or vacant lots but on the contrary "all increases in improvement values were allocated to improvement assessments and all increases in land values were allocated to land assessments." Respondents deny that the assessor arbitrarily refrained from making any increase in valuations of one-family dwelling improvements and "allege that after considering all of the factors relating to value" the assessor determined that "there had been no established increase in value of such . . . dwellings."

It thus appears that, as indicated above, the chief contention of petitioner is that the alleged action of the assessor in making general substantial increases in the 1946 assessed valuations of multiple-dwelling properties and in failing to make such increases, except in a few isolated instances, against either one-family dwellings or against vacant lots, constituted an arbitrary and unlawful discrimination against the owners of multiple dwellings and brought about an unequal tax burden upon them.

The provision of section 1, article XIII, of the California Constitution that "All property in the State . . . shall be taxed in proportion to its value," is mandatory. (*San Pedro etc. R. R. Co.* v. *Los Angeles* (1919), 180 Cal. 18, 21 [179 P. 393].) As declared in *Birch* v. *County of Orange* (1921), 186 Cal. 736, 741 [200 P. 647], "the taxpayer is en-

titled to . . . the exercise of good faith and fair consideration on the part of the taxing power in assessing his property, at the same rate and on the same basis of valuation as that applied to other property of like character and similarly situated. Inequality of taxation is produced as surely by inequality of valuation as by inequality of the rate of tax.'' (See, also, *Los Angeles Gas & Elec. Co.* v. *County of Los Angeles* (1912), 162 Cal. 164, 168 [121 P. 384] ; *Southern Pac. Land Co.* v. *San Diego County* (1920), 183 Cal. 543, 546 [191 P. 931] ; *Mahoney* v. *City of San Diego* (1926), 198 Cal. 388, 398 [245 P. 189].) However, ''it is well settled in this state that to the authorized county board of equalization has been confided the duty of determining 'the value of the property under consideration for assessment purposes upon such basis as is used in regard to other property, so as to make all the assessments as equal and fair as is practicable'; that in discharging this duty, 'the board is exercising judicial functions, and its decision as to the value of the property and the fairness of the assessment so far as amount is concerned constitutes an independent and conclusive judgment of the tribunal created by law for the determination of that question,' adjudicating necessarily that 'the property is assessed at the same value proportionately as all other property in the county'; that such adjudication 'cannot be avoided unless the board has proceeded arbitrarily and in willful disregard of the law intended for their guidance and control, with the evident purpose of imposing unequal burdens upon certain of the taxpayers . . . or unless there be something equivalent to fraud in the action of the board'; and that 'Mere errors in honest judgment as to the value of the property will not obviate the binding effect of the conclusion of the board.' [Citations.]'' (*Universal Cons. Oil Co.* v. *Byram* (1944), 25 Cal.2d 353, 356-357 [153 P.2d 746].)

Where, as here, it is substantially contended that fraud or ''something equivalent to fraud'' results from arbitrary action of the board in declining to equalize the assessed valuations of property, the proceedings before the board are subject to review. As observed in *La Prade* v. *Department of Water & Power* (1945), 27 Cal.2d 47, 53 [162 P.2d 13], ''Where a local . . . tribunal exercises quasi judicial powers its action may be reviewed by either mandamus or certiorari. [Citations.] And in such a review the chief issues are whether

the person affected has been accorded a hearing, and, if so, whether there is any evidence to support [the board's] . . . determination. [Citations.] In the review proceedings the court should confine itself to the showing made before the . . . tribunal with regard to the sufficiency of the evidence. [Citations.]'' (See, also, *Garvin* v. *Chambers* (1924), 195 Cal. 212, 220-222 [232 P. 696]; *Swars* v. *Council of City of Vallejo* (1944), 64 Cal.App.2d 858, 864 [149 P.2d 397].) Instances in which the courts of this state have reviewed by certiorari the actions of local boards of equalization may be found in *Huntley* v. *Board of Trustees* (1913), 165 Cal. 298 [131 P. 859] and *Birch* v. *Board of Supervisors* (1923), 191 Cal. 235 [215 P. 903]. The cases are not altogether uniform as to the scope of such review. (See discussion and cases cited and reviewed in concurring opinion in *Sipper* v. *Urban* (1943), 22 Cal.2d 138, 148-153 [137 P.2d 425].) The California rule has often been declared to be the traditional view that the review ''cannot be extended further than to determine whether the inferior tribunal . . . has exceeded its jurisdiction.'' (See Code Civ. Proc., § 1074; 4 Cal.Jur. 1105-1106, and cases there cited.) But in the application of the general rule to various factual situations difficulty has appeared in defining ''jurisdiction'' as the word is used in the rule and in distinguishing between the excess of jurisdiction which is vulnerable on certiorari, and mere errors in exercising jurisdiction which are held not cognizable in such proceeding. (See *Fortenbury* v. *Superior Court* (1940), 16 Cal.2d 405, 408 [106 P.2d 411]; *Abelleira* v. *District Court of Appeal* (1941), 17 Cal.2d 280, 291 [109 P.2d 942, 132 A.L.R. 715]; *Redlands etc. Sch. Dist.* v. *Superior Court* (1942), 20 Cal.2d 348, 360-365 [125 P.2d 490].) However, we are satisfied that, as hereinafter appears more fully, upon any view as to the scope of this proceeding petitioner has not established that the evidence before the board of equalization was insufficient to support its determination as to the correctness and legality of the disputed assessments; nor, upon any view of the scope of certiorari, is the showing here sufficient to authorize annulment of the board's order for any vice in its own procedure.

Inasmuch as no claim is made that petitioner and other owners of multiple dwellings were not accorded a hearing by the board in this case, we turn to consideration of the sufficiency of the evidence to support the board's determina-

tion that the property of petitioner and those whom she represents should be assessed at the valuations placed thereon by the assessor for the taxable year in question. For this purpose a transcript of the applications and exhibits filed with the board as well as a reporter's transcript of the oral hearing has been filed in this court.

From the record it appears that applications to the board which were considered at such hearing were divided into six groups. Group A, involving approximately 21,530 dwelling units, represented "those multiple dwelling owners whose improvements have been increased only and the land remained as before. Group B are those that have the same class except that some of their real estate has been increased to a slight extent. Group C represents the multiple units known as hotels. Group D represents office buildings. . . . Group E are wholesale and retail mercantile properties, and Group F are protests protesting the increased assessment of land only."

James O. Stevenson, agent for certain of the applicants for reductions by the board, testified that he was then the director of the Los Angeles Bureau of Municipal Research, "one of the purposes of which is to appraise real and personal property and to study all phases of taxation and tax equalization, principally within the County of Los Angeles"; that as the result of studies made by himself and the bureau and alleged information from the assessor and the latter's building department the witness had concluded that prior to 1946 the assessor had applied the "straight line" method of depreciation to all improvements in the county in fixing the assessed valuations but in 1946 had altered the method of assessing multiple-dwelling improvements by adopting a higher replacement cost and by changing from the "straight line" to the "reducing balance" or "declining balance" depreciation method; that the change, coupled with "hypothetical unit cost factors" used by the assessor, resulted in 1946 assessed valuations of multiple-dwelling properties of from 20 per cent to 100 per cent higher than those of 1940 through 1945; that the change was not applied to the approximately 650,000 single-dwelling improvements in the county and consequently those properties were not increased in valuation as were multiple dwellings; that only 14.2 per cent of dwelling properties in the county are of multiple type and the remainder are one-family dwellings; that of the one-family dwellings 43 per cent were in April, 1940, rented in compe-

tition with multiple dwellings; that in 1946, the assessor continued to apply the "straight line" depreciation method to all industrial and commercial buildings and "that the assessed valuation thereof . . . has not been changed to and including the year 1946, except as to hotels, Class 'A' office buildings, lofts, stores and theaters and other minor exceptions incidental to additions, alterations or reclassifications."

The witness stated further that although the multiple-dwelling improvements of the 467 Group A petitioners had been raised in valuation, no increase was made of the land underlying such improvements, although "it is generally known that improved building sites are scarce and that prices therefor have advanced fully as much as the cost or value of buildings and improvements"; that in some of the 232 Group B properties both land and improvements had been raised, "thereby increasing the total assessments of such property . . . a greater amount than the property of petitioners in Group A was increased"; that the valuations placed on the improvements of the Group C petitioners (26 hotel owners) had also in 1946 been increased from 60 per cent to over 200 per cent as a result of changing the assessment method; that "as to some of the said hotel properties, the real estate assessment has been increased also, pursuant to some local scheme"; that many of such hotels are located in downtown Los Angeles or in other commercial districts and are of a type of construction similar to that of office buildings in the same vicinities, but were assigned increases in valuations far greater than the increases of office buildings; that the office, loft and theater buildings of the 24 Group D petitioners were also increased in valuation approximately 25 per cent as the result of change in assessment method; that the land under such buildings was also increased in valuation in 1946 "by another method which affected the properties . . . unequally"; that both the improvements and the land of the 12 Group E petitioners (owners of properties used for retail or wholesale merchandising) were increased in valuation in 1946, although most improvements "of a similar nature or in similar and competitive use" were not raised; that the 10 Group F petitioners "are protesting the increased assessment of land. . . . The reasons for such increased assessment are applicable, if applicable at all, to all land in the County"; that the witness "saw no evidence" that, as suggested by petitioner, the assessor had assigned to land those valuations that "belong to improvements" or vice versa.

The witness also made statements of the effect upon property values of such factors as frozen rentals, increased costs of operation, higher selling prices, alleged shift of population distribution, comparative volumes of business, and other factors entering into business competition. He submitted charts of seven complete blocks of one-family dwellings in the county in which no assessed valuation increases were made in 1946; of two such blocks in which most of the land had been increased but none of the improvements; one block in which all land had been increased but only one of the approximately five houses; three blocks of both multiple and one-family dwellings in which all the multiple-dwelling improvements had been increased from one-third to one-half over the 1945 valuations, but no other increases had been made. Other charts set forth the 1945 and 1946 assessed valuations and the percentage of increase in 1946 of 24 specified apartment building improvements, of 16 named hotel improvements, and of 20 office building improvements; still others purported to state the relationship between assessed valuations and sales prices (as indicated by internal revenue stamps on deeds) of properties in various districts throughout the county. Depreciation tables submitted by the applicants demonstrated that over a period of years property depreciated by the "straight line" method would show a balance of taxable value much lower than that of property depreciated at the same percentage rate by the "reducing balance" method.

On cross-examination the witness Stevenson admitted that he had no personal knowledge of the current assessment methods of the assessor and that his information was based upon alleged statements by the assessor and the head of the latter's building department and upon studies of various statistical reports and of copies of "building slips" or working records of the assessor's office secured by the witness prior to the closing of such records to public inspection in 1941 (Rev. & Tax. Code, § 408); that his "checking" of 1946 assessments covered "most" of the county but did not include various residential districts such as Glendale, Tujunga, Montrose, Pomona, Sunland, Pasadena, or Temple City; that all property in San Fernando Valley had been increased in assessed valuation; that "sales prices do not always indicate market value," and "I consider the valuation of prices being paid for single family residences as being artificial"; that such situation is "a result of . . . a kind of bonus for occupancy

or space because of the peculiar conditions which exist at the present time''; that current sales prices of single-family residence properties ''exceed sound value by as much as 100%.''

Other witnesses appearing on behalf of the applicants gave to the board their views on the relationship between frozen rental income and the 1946 assessed valuations. A résumé of their testimonies would serve no useful purpose here.

In support of the valuations for tax purposes assigned to the properties of the various petitioners for 1946, Mr. J. W. Hartman, Assistant Assessor of Los Angeles County, stated that there are in the county in excess of 1,238,000 parcels of land to be taxed, with ''a million structures of every type and character,'' and 800,000 ''assessments of personalty''; that certain of the assessor's staff (''with a permanent personnel in excess of 412, and a recurrent personnel in excess of 1,000'') secure and evalue ''information relative to structures and the application of the same in valuation,'' and others of the staff ''concern themselves primarily with information which leads to the determination of land values of both improved and unimproved properties''; that in valuing improvements the assessor keeps ''certain basic records,'' referred to as ''building slips''; that the slips do not ''show all factors . . . used in computing the value of the property'' but ''only a detailed description of the property, its geographical location, its estimated probable cost, area, the arithmetical calculations of the appraiser, the year it was constructed and other recorded information''; that in determining assessed valuations the assessor and his staff consider also ''the site, surrounding territory, the type and class of structures adjacent and nearby,'' selling prices, commodity indexes, ''capitalized income, expressions of market value by informed people . . . and a host of other data''; that after a final joint survey by the assessor's land and building departments the property ''is considered as a whole,'' is equalized with other properties and the total fair value is determined; that half of such value is used for assessment purposes. Mr. Hartman stated further that in 1946 the valuation of land underlying single-family residences had been increased in many instances but that of the improvements had remained at the 1945 figure because in the opinion of the assessor ''there was not sufficient evidence as of the first Monday of March, 1946, to justify such an increase. The Assessor was of the opinion that the sales prices of single family residences were not

reflective of market value but . . . contained . . . a bonus for occupancy'' which in many instances meant that ''you have to deduct *60% of the sales price* to get down to market value.'' (Italics added.)

''With respect . . . however . . . [to] multiple units . . . for rental purposes, this was not capital buying shelter but rather . . . capital soundly seeking safe investment at the highest rate of interest available with safety. The very volume of these transactions has been indicative of the soundness of the investment and the trend of market value with respect to these properties. In the consideration of these properties with respect to all other properties where increases were made, the Assessor in each instance took into consideration every evidence which he could discover affecting the determination of the value of the properties.

''With respect to single family residences, the Assessor came to the conclusion that the bonus for occupancy, while it constituted a part of the sales price, did not represent market value and so the Assessor did not attempt to reflect such bonus . . . in the assessed valuation. . . . [But] in the purchase of income properties capital was seeking the highest possible return with the least . . . risk, and such sales . . ., in the opinion of the Assessor, did not contain any bonus for occupancy but represented . . . and constituted an index for the determination of market value.'' The witness also stated that in 1946, all properties in the county were assessed by the same methods as theretofore used and were equalized one with the other; that no single depreciation method or ''set formula'' was used, but rather ''all types of depreciation known''; that if sales data alone were taken as evidence of apartment house values ''we would have at least *twice the assessed value* [italics added] we have now''; that in his opinion not over 15 per cent to 20 per cent of the single-family dwellings in the county were occupied by tenants rather than by owners. In answer to the question, ''Mr. Hartman, isn't it a fact that you have a plan for revaluation of practically all properties in Los Angeles County, and have had it on hand for some time?'' the witness stated, ''We have plans all the time for valuation of properties. We are never without them.'' He further declared that he had neither stated nor heard the assessor state an intention to increase generally the assessed valuations of single residences or of office buildings in 1947.

Mr. John R. Quinn, Assessor of Los Angeles County, corroborated much of Mr. Hartman's testimony and in addition testified that he had at no time stated either "publicly or otherwise to Mr. Stevenson," the applicants' agent and witness, that in 1946 he was "going to use a particular mathematical scheme or formula to arrive at the assessed valuations" of the applicants' properties which would differ from that used for all properties, or that any increases whatever would be made "by the application of a precise mathematical formula" or that any property was to be "singled out for raising."

Mr. Potter, head of the assessor's building division, said that he had at no time stated to Mr. Stevenson that the properties involved at the hearing were "going to be increased this year by any invariable mathematical formula" or that the assessor "proposed to single out for a raise this year any particular class or group of property"; that in making 1946 assessments he had followed the method explained by Mr. Hartman; that every year "we have a representative visit every piece of property in the County," including the 650,000 single-family dwellings.

Upon the demand of petitioners and after waivers by them of any "confidential information" appearing, the building slips or working records of the assessor's office on certain of the hotel and other commercial properties involved in the hearing were produced before the board. Photostatic copies of various of such slips are in the record.

From the testimony quoted it is apparent that the statements of the assessing officers as to methods employed and factors entering into determination of assessed valuations of property throughout the county, including that of the applicants seeking reductions from the board, support the board's order refusing the applications.

Petitioner sets forth in one of her briefs an "analysis" of the 1946 building slips produced by the assessor which petitioner asserts demonstrate that the assessor "depreciated the replacement value [of the properties described in such slips] . . . by a reducing balance method to arrive at assessment value." She argues also the effect had upon relative values of multiple dwelling and of single-family properties by higher sales prices, frozen rentals and increased maintenance and operating costs, higher production costs, and lower purchasing power of the dollar. In this connection she emphasizes particularly that sales prices of both single-unit and

multiple-unit dwellings had shown marked increases during the years between 1940 and 1946, but that the assessor had made general increases in assessed valuations for 1946 of multiple dwellings only. However, as recited hereinabove, the witness Hartman testified that as to single dwellings "you had to deduct 60% of the sales price to get down to the market value" and that as to apartment house properties "we would have at least twice the assessed value we have now" if sales data alone were taken as evidence of value. It thus appears that the board could properly find that the assessor fixed the market value in each of the two types of improvement at approximately 50 per cent of their sales price value and that there was no arbitrary inequality between them in this respect.

Arguments as to the weight of the evidence, including the various elements of value, were addressed to the board and by it determined adversely to petitioner and the other applicants, and the factual decision of the board upon the evidence before it cannot, in view of the substantial conflicts shown, be disturbed by this court (*Universal Cons. Oil Co.* v. *Byram* (1944), *supra*, 25 Cal.2d 353, 356-357) or held to be beyond the board's jurisdiction in any sense of the word.

It does not appear that the board's refusal to consider or permit the introduction of building slips which the applicants asserted would demonstrate that the assessor contemplated increasing the assessed valuations of single-family residences for the taxable year 1947, entitle the applicants to the relief sought here. As recited above, the witness Hartman testified that the slips were simply working records of the assessor's office, that in determining assessed valuations various elements not indicated on the slips were considered by the assessor's staff, and, in addition, that "We have plans all the time for valuation of properties. We are never without them." Such refusal to receive or consider the working records of the assessor's staff for the contemplated 1947 assessment does not appear to have been arbitrary or to have deprived petitioner of the fair hearing to which she was entitled. In the light of the very substance claimed for them, as well as of the other evidence, such working slips apparently would cast no light upon relative values for the taxable year 1946, or upon the ultimate actual valuations which might be reached by the assessor for 1947; nor would they, in view of the detailed explanation given by the assessor and his staff

138

of the methods of appraisement employed and the multiple factors entering into their estimates of values, tend to demonstrate either actual fraud or "something equivalent to fraud" on the part of the assessing authorities. (See *Universal Cons. Oil Co.* v. *Byram* (1944), *supra*, 25 Cal.2d 353, 356-357, and authorities there cited.)

Unquestionably the record of proceedings before the board reflects substantial evidence which tends to support the claims of petitioner and of those whom she represents, but by reason of the material and extensive conflicts which we have reviewed we feel bound to conclude that the right to the annulling action of certiorari has not been established.

For the reasons above stated the proceedings and order reviewed are affirmed. (Code Civ. Proc., § 1075.)

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.

Petitioner's application for a rehearing was denied June 19, 1947.