[Civ. No. 42532. Second Dist., Div. Five. July 17, 1974.]

LOUIS F. DOMENGHINI, as Trustee, etc., Plaintiff and Appellant, v. COUNTY OF SAN LUIS OBISPO et al., Defendants and Respondents.

## Counsel

Robert N. Tait, District Attorney, and Robert J. Schum, Deputy District Attorney, for Defendants and Respondents.

Ogle & Gallo, J. K. George and Gerald Mason for Plaintiff and Appellant.

## Opinion

**LORING, J.**[*]—Louis F. Domenghini, as trustee, under the will of Angelo Domenghini, deceased (Taxpayer) filed a "Complaint for Recovery of Taxes paid under Protest Pursuant to Revenue and Taxation Code Section 5138" against the County of San Luis Obispo (County) to recover $2,690.91 which Taxpayer paid as the result of "escaped assessment" for each of the taxable years 1966-1970. Taxpayer alleged that the imposition of the tax "was erroneous and constituted a denial of plaintiff's right to due process under the constitutions of the State of California and the United States of America, because it was based on a determination made by said Board [the board of supervisors sitting as an assessment appeals board] without substantial supporting evidence; that the only credible evidence before said Board disclosed that either plaintiff did not own the property upon which said alleged escape assessment[1] was based or else

---

[*]Assigned by the Chairman of the Judicial Council.

[1]The use of the singular throughout the complaint and briefs appears to be erroneous since we are actually concerned with four separate escape assessments for four separate taxable years. However, since the legal problems are identical as to each year, we will, as did counsel, use the singular.

the method adopted by the assessor for determining the actual cash value of the property owned by plaintiff was incorrect." Attached to the complaint as exhibits were copies of written findings of fact by the assessment appeals board which simply found: "1. This taxpayer did own property subject to escape assessment for the year [the board inserted the year in question]. 2. Said property consisted of feed and cattle. 3. The actual cash value of said property was not broken down between cattle and feed by the Board in making its determination of full cash value. 4. The method of valuation used by the Board in making its determination of actual cash value was market value. Dated: November 19, 1971."

The parties entered into a stipulation which provided inter alia, that the complaint should be deemed amended to claim attorney's fees under Government Code section 800 and that the case be tried on the transcript of proceedings before the assessment appeals board.

After nonjury trial the court rendered its memorandum decision and findings of fact in favor of County upholding the validity of the assessment and the resulting tax and rendered judgment in favor of County denying Taxpayer's claim for refund. Taxpayer appeals from the judgment.

CONTENTIONS

Appellant contends:

1. The court's judgment in favor of County is not supported by substantial evidence.

2. The assessment appeals board acted erroneously by their findings in refusing to distinguish between the value of cattle and the value of feed.

FACTS

For many years Taxpayer was in the business of raising beef cattle for commercial purposes at several different locations in San Luis Obispo County, and as an incident thereto grew some portion of the feed which the cattle required. Taxpayer testified that he prepared the information statement required by Revenue and Taxation Code section 441[2] (hereafter all references are to the Revenue and Taxation Code unless otherwise noted) which he submitted to the assessor for the tax year 1968-1969 and that the number of cattle shown by him in that statement as being owned by

---

[2]Although a rather lengthy section in substance the section requires every person owning taxable personal property of a value in excess of $30,000 to file a property statement by a certain date and specifies the contents of such statement.

Taxpayer on the lien date was based on actual hand count;[3] that the number of cattle constantly fluctuates due to purchases and sales and calving and mortality and the amount of feed available. The statement also reported that Taxpayer had no feed on the lien date. The assessor apparently became suspicious of the accuracy of the Taxpayer's information statement because of the statement that Taxpayer had no feed for the cattle on the lien date and demanded additional information under section 470[4] which Taxpayer did not supply. Taxpayer originally denied that he had any additional information.[5] Assessor then made an "estimate" that Taxpayer had 2,300 head of cattle in his possession on the lien date and estimated the amount of grain which Taxpayer had in his possession on the lien date and levied an escape assessment accordingly under the provisions of section 501.[6] Taxpayer appealed to the assessment appeals board of San Luis Obispo County. Before the appeal was determined the assessor obtained a copy of a loan application filed by Taxpayer with the Production Credit Association of San Luis Obispo, dated April 24, 1968. Such loan application, based upon a field appraisal by a representative of Production Credit Association, indicated that Taxpayer then owned 249 head of cattle and $51,000 worth of feed, more than had been listed in his property statement filed pursuant to section 441.[7] The assessor requested the assessment appeals board to reduce the estimated number of cattle which formed the basis for the escape assessment and the amount of feed to coincide with the number of cattle and the amount of feed shown on Taxpayer's

---

[3]Taxpayer declared he owned 19 commercial grade bulls, no registered bulls, 35 registered cows, 487 commercial cows, 81 registered heifers and 460 commercial calves of a total cash value of $105,530.

[4]"§ 470. Upon request of an assessor, a person owning, claiming, possessing or controlling property subject to local assessment shall make available at his principal place of business, principal location or principal address in California or at a place mutually agreeable to the assessor and the person, a true copy of business records relevant to the amount, cost and value of all property that he owns, claims, possesses or controls within the county."

[5]A couple of weeks before the hearing before the board, Taxpayer did turn over to the assessor some journal books.

[6]Revenue and Taxation Code section 501 then read:

"§ 501. If after written demand by the assessor, any person fails to comply with any provision of law for furnishing information required by Sections 441 and 470, the assessor, based upon information in his possession, shall estimate the value of the property and, based upon this estimate, promptly assess the property."

[7]The loan application indicated that on April 28, 1968, Taxpayer owned 32 registered bulls, 617 cows, 84 heifers, 104 weaner calves and 475 small calves of a total value of $219,975. Feed was inventoried at 450 tons of oat hay, 1,500 tons of silage, 250 tons of alfalfa hay of a total value of $53,500.

The Production Credit Association made an inventory for every year.

loan application. The assessment appeals board arrived at even lower figures.

## DISCUSSION

At the outset, we are confronted with two rather basic questions insofar as the proceedings in the superior court (the only proceedings we have power to review) are concerned: (1) Who had the burden of proof, and (2) what proof did the burden of proof require.[8]

■ Taxpayer argues that an action to recover taxes paid under protest is in the nature of an appeal from the decision of the board of assessment appeals (*McClelland* v. *Board of Supervisors,* 30 Cal.2d 124 [180 P.2d 676], cert. den., 332 U.S. 823 [92 L.Ed. 399, 68 S.Ct. 164]), and that where a finding of fact is challenged on the ground that it is not supported by substantial evidence, it must be reversed where it is not supported by substantial evidence (*Los Angeles Dodgers, Inc.* v. *County of Los Angeles,* 260 Cal.App.2d 679 at p. 683 [67 Cal.Rptr. 341]). Taxpayer then quotes *A. F. Gilmore Co.* v. *County of Los Angeles,* 186 Cal.App.2d 471 [9 Cal.Rptr. 67], as defining the term substantial evidence. Taxpayer relies upon *De Luz Homes, Inc.* v. *County of San Diego,* 45 Cal.2d 546, 561 [290 P.2d 544], as authority for the proposition that the term "value" of property subject to taxation under California Constitution, article XIII, section 1, means market value, i.e., the price at which it can be sold-freely in the open market without exigencies on either side. From this point Taxpayer seems to argue that since there was not a substantial factual basis for the assessment appeals board's conclusions, the superior court was required to reverse the assessment appeals board and this court is therefore required to reverse the superior court.[9]

Taxpayer's conclusion is based upon the assumption that his written application to the Production Credit Association of San Luis Obispo was improperly received in evidence since it related to conditions as they existed several weeks after the lien date. If that evidence had been excluded, Taxpayer argues, there would then be no factual basis for the findings of the assessment appeals board.

Taxpayer's argument overlooks the unique function of an assessor especially where we are concerned with an escape assessment on moveable personal property. Section 401 provides: "Every assessor *shall* assess *all* property subject to general property taxation . . . ." (Italics ours.) This

[8]Both sides agree that *Strumsky* v. *San Diego County Employees Retirement Assn.,* 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29], does not apply to this case.

[9]The cases cited by Taxpayer in this regard do not appear to have involved escape assessments on moveable personal property. Only one case, *De Luz Homes, Inc.,* *supra,* involved an escape assessment which was on an interest in real property.

duty is mandatory (cf. *Knoff* v. *City etc. of San Francisco,* 1 Cal.App. 3d 184 [81 Cal.Rptr. 683]). Section 441 requires certain owners of personal property to file certain information; section 454 et seq. gives the assessor certain rights of discovery. Section 462 imposes criminal penalties for, inter alia, failure to "make available to the assessor any information which is required by subdivision (d) of Section 441 of this code."[10] Section 470 requires the owner of property to make available to the assessor "a true copy of business records relevant to the amount, cost and value of all property that he owns, claims, possesses or controls within the county" and section 501 provides that when the property owner fails to comply "the assessor, *based upon information in his possession,* shall *estimate* the value of the property and, *based upon this estimate,* promptly assess the property." (Italics ours.) The assessor's functions are inquisitorial not adversary.

The Taxpayer cannot claim that he has been denied the right to be heard when he is accorded the first opportunity to produce the required data. When he refuses to do so, the assessor is not thereby relieved of this obligation to act. He is still required by law to assess the value of *all* taxable property, but he is then authorized to utilize whatever evidence is available to him. If that evidence is less than the best, the Taxpayer has no one to blame but himself. At that point, the law wisely refrains from attempting to prescribe technical or meticulous rules of evidence since the greater good requires that no property shall escape its just burden of taxation. The law then requires only that the assessor act "based upon information in his possession."

■ The assessor is not required to hear evidence, but may apply his own judgment. (*Oakland* v. *Southern Pacific Co.,* 131 Cal. 226 [63 P. 371].) The principles are stated: "The law is silent on the mode of ascertaining the cash value. No subsidiary principles of evaluation are laid down, and the assessor is unrestricted in making his estimates. He must be guided by those general principles that everywhere determine the valuation of property. There is no rigid rule for valuation of property by the assessor. Different minds may be expected to differ honestly in their judgments. After considering the circumstances and the various factors influencing value, it is the assessor's duty to exercise a prudent discretion in reaching conclusions. The magnitude of the assessor's task—appraisal and

---

[10]Subdivision (d) of section 441 reads: "(d) At any time, as required by the assessor for assessment purposes, every person shall make available for examination information or records regarding his property. In this connection details of property acquisition transactions, construction and development costs, rental income, and other data relevant to the determination of an estimate of value are to be considered as information essential to the proper discharge of the assessor's duties."

assessment of all property within a limited time—demonstrates the necessity for him to promulgate general rules, formulas, and percentages for depreciation, construction costs, square foot area charges, and other factors, in order to secure uniformity." (46 Cal.Jur.2d 698-699, Taxation, § 184.)

■ The assessment appeals board is not bound by technical rules of evidence. (*A. F. Gilmore Co.* v. *County of Los Angeles,* 186 Cal.App.2d 471 at p. 476 [9 Cal.Rptr. 67].) ■ The assessment of property for the purpose of taxation is a function of the executive branch of the government and the judiciary has no power or jurisdiction to inquire as to actual value of property in order to determine whether or not it has been properly assessed. (*Clunie* v. *Siebe,* 112 Cal. 593 [44 P. 1064].) In *Clunie, supra,* petitioner sought a writ of mandate to compel the assessor to value a street railway at its true value and not rely on false information supplied by street railway officials. In denying the writ the Supreme Court said at pages 597-598: "The assessment of property for the purposes of taxation is a function of the executive department of government, but the proceeding contemplated by the petition herein would transfer that function to the judicial department of the government. In order to determine whether there had been any misrepresentation of the value of the property, it would be necessary to ascertain its actual value, and for a court to enter upon this investigation would be to step beyond the boundaries of its constitutional jurisdiction, and intrude within those which, in the division of governmental functions, have been, by the organic act, placed elsewhere."

■ The California Constitution, article XIII, section 9, establishes the board of supervisors of each county as an assessment appeals board to review the acts of the assessor in which role they act in a quasi-judicial capacity. (*Eastern-Columbia, Inc.* v. *County of L.A.,* 61 Cal. App.2d 734 [143 P.2d 992]), and it is their duty, not the court's, to determine the value of property for assessment purposes. (*Universal Cons. Oil Co.* v. *Byram,* 25 Cal.2d 353 [153 P.2d 746].) The rule is stated as follows: "Though it is not universally true elsewhere, in this state the conclusion of the assessing officers concerning the value of property for purposes of taxation, when honestly arrived at and not made pursuant to some fixed rule or general system the result of which is necessarily discriminatory and inequitable, is conclusive on the courts, however erroneous it may be. Both the assessor and the board of equalization exercise judicial functions, and when they have acted within the limits of reasonable discretion their judgment is unassailable. It is only when the conclusions of assessing officers are not honestly arrived at, or are made pursuant to some fixed rule or general system the result of which is necessarily discriminatory and

inequitable, that the courts will interfere." (46 Cal.Jur.2d, 712, Taxation, § 198.)

■ Taxpayer is not entitled to a trial de novo in the superior court. In *Glidden Company* v. *County of Alameda*, 5 Cal.App.3d 371 [85 Cal. Rptr. 88, 86 Cal.Rptr. 464], the court said at pages 378, 382-383: " 'The duty of determining the value of the property and the fairness of the assessment is confided to the appropriate county board of equalization. Furthermore, in discharging this duty, the board's determination upon the merits of the controversy is conclusive; the taxpayer has no right to a trial de novo in the superior court to resolve conflicting issues of fact as to the taxable value of his property. [Citations.]'

" 'The question presented to the superior court in such an action is whether there was evidence of sufficient substantiality before the board to justify the finding [citation], and in the absence of fraud or malicious or arbitrary use of its powers the board is the sole judge of questions of fact and of the values of property. [Citation.]'

" 'The taxpayers [*sic*] has the burden of showing the board that the assessor's figures are improper and the assessments are not fair and equitable. [Citations.]'

" 'It is a rule applicable to assessors and to boards having assessing powers that it is presumed that the assessing officers have properly performed the duties entrusted to them, and, consequently, that their assessments are both regularly and correctly made.' "

It is true that the loan application which Taxpayer filed with the Production Credit Association related to a date several weeks after the lien date, but apparently it was the best evidence available.

In *Michael Todd Co.* v. *County of Los Angeles*, 57 Cal.2d 684 [21 Cal.Rptr. 604, 371 P.2d 340], the county assessor was required to fix the assessment value of a motion picture and in doing so, took into consideration the taxpayer's records regarding production costs which of necessity related to dates other than the lien date. In approving such procedure the Supreme Court at pages 697-698 said: "As we observed in *De Luz Homes, Inc.* v. *County of San Diego* (1955), *supra*, 45 Cal.2d 546, 563-564 [15], 'Assessors generally estimate value by analyzing market data on sales of similar property, replacement costs, and income from the property [citations], and since no one of these methods alone can be used to estimate the value of all property, the assessor, subject to requirements of fairness and uniformity, may exercise his discretion in using one or more of them.'

"It is true, as plaintiff emphasizes, that the *standard* of valuation prescribed by statute is 'full cash value' rather than cost per se. But in proper circumstances cost may serve as a point of departure from which the assessor may proceed to determine 'full cash value.' While the use of production cost for this purpose (rather than 'replacement cost') has been criticized (see 1 Bonbright, The Valuation of Property, pp. 140-149), we are not committed to the view that the former figure must automatically be excluded from consideration. Thus, in *Mahoney* v. *City of San Diego* (1926), *supra,* 198 Cal. 388, 402 [7], this court described 'cost of construction' as one of the 'elements which in common experience ordinarily determine values' for assessment purposes; and in *Kaiser Co.* v. *Reid* (1947), *supra,* 30 Cal.2d 610, 623 [8], we quoted with approval language of the Connecticut court (*Underwood Typewriter Co.* v. *City of Hartford* (1923), *supra,* 122 A. 91, 94 [5, 6]) suggesting a method of valuation based on 'the original cost of construction and improvements. . . .' Under normal conditions, of course, the shorter the lapse of time between construction and assessment, the more closely actual construction cost will correspond to estimated 'replacement cost.' Here the production cost of the property had but recently been incurred, and plaintiff failed to show that a hypothetical 'replacement cost' figure would be substantially different from the actual cost of production. While we do not imply that use of the latter cost figure would in all instances be sound assessment practice, in the present case the assessor in the exercise of his discretion could properly consider the production cost of the subject negatives as a substantial element in estimating their taxable value."

In *County of Riverside* v. *Palm-Ramon Development Co.,* 63 Cal.2d 534 [47 Cal.Rptr. 377, 407 P.2d 289], the county assessor was required to fix the assessment value of possessory interest in tax exempt Indian lands at Palm Springs. In doing so the assessor estimated future income which the possessory interest would presumably produce. The taxpayer claimed that the assessor should have used the actual history of income as the basis for assessment. The Supreme Court in overruling this contention said at pages 538-539: "Here it appears that the actual income will be derived largely from enterprise activity (development, subleasing, percentage renting for commercial or professional usage). Further, the assessor found a method which approximated the 'imputed income' method to be both useful and appropriate in view of his determination that there was a lack of actual income and expense history, and no error is shown. Defendants' suggestion in their brief that the income history in *De Luz* was 'slight compared to that available here,' cannot be taken seriously. The trial court, as stated, found that defendants had failed to produce any such history for the use

of the assessor or the board of equalization, and defendants neither challenge such finding nor point to any showing to the contrary in the record."

 The law obviously does not anticipate that the assessor hand count each and every item of personal property in existence in the county on the precise lien date, not only because it is a manifest physical impossibility, but also for the very simple reason that since section 441 permits the taxpayer to file his property declaration after the lien date, the assessor may not even discover the existence of taxable property until after the lien date has passed and possibly even after the removal of the property from the county. Under such circumstances, as we have already noted, the assessor may call on the taxpayer to produce information, and failing such, the assessor may make an escape assessment under section 501[11] in the form of an "estimate" based upon the information in his possession, that is on the best information then available to him.

In his property declaration, Taxpayer declared that he owned no registered bulls. In the loan application on April 28, 1968, he declared that he owned 32 registered bulls. Taxpayer's claim that the discrepancies between the two documents could be accounted for by reason of mortality and calving and the amount of feed available was palpably absurd, at least in the case of registered bulls. If Taxpayer had acquired 32 registered bulls between the lien date and April 28, 1968, he could have produced records or other evidence to establish that fact. Likewise, in his property declaration he declared he had no feed. In the loan application he had feed of a value of $53,500. Although Taxpayer produced some of the feed, he purchased the balance. If he purchased the feed after the lien date, records or other evidence of those purchases should have been available. When a taxpayer refuses to produce evidence which the law requires him to produce at the request of the assessor, his lamentation thereafter that the assessor acted without adequate evidence has the ring of hypocrisy.

We conclude that Taxpayer did not carry the burden showing that the board of assessment appeals acted arbitrarily or fraudulently—that is that they acted without "any" evidence to support its determination. (*McClelland* v. *Board of Supervisors,* 30 Cal.2d 124 at p. 130 [180 P.2d 676].) "The taxpayer has the burden of showing the board that the assessor's figures are improper and the assessments are not fair and equitable." (*Griffith* v. *County of Los Angeles,* 267 Cal.App.2d 837, 842 [73 Cal. Rptr. 773] [cert. den., 395 U.S. 945 (23 L.Ed.2d 463, 89 S.Ct. 2018)].)

---

[11]We note that section 501 is included within article 3 which is entitled "Arbitrary . . . assessments."

■ Taxpayer next contends that the action of the assessment appeals board should be reversed because it did not segregate the value of cattle from the value of the feed, but in effect lumped everything all together under one heading. Section 602 specifies the contents of the assessment roll. It provides, inter alia: "This local roll shall show: . . . (d) Personal Property. A failure to enumerate personal property in detail does not invalidate the assessment." The description was sufficient. (*Dear* v. *Weineke,* 94 Cal. 322 [29 P. 646]; *Dear* v. *Varnum,* 80 Cal. 86 [22 P. 76]; *Savings etc. Soc.* v. *San Francisco,* 131 Cal. 356 [63 P. 665].)

The assessor was required by law to determine the value of the entire property, not determine the number of cows. (*El Tejon Cattle Co.* v. *County of San Diego,* 252 Cal.App.2d 449 [60 Cal.Rptr. 586].) The *El Tejon Cattle Co.* case likewise involved assessment of cattle. "There was a single assessment as follows: 'Personal property value $131,660'." (P. 452.) The court of appeal held the assessment proper saying: "The assessment here was a single one upon personal property. Such a general description for assessment purposes is sufficient." (P. 459.) In *El Tejon Cattle Co.* like the case at bar, there was a dispute between taxpayer and the assessor over the number of cattle which taxpayer owned. The assessor claimed 3,000 cows of the value of $40 each, 200 other cattle, none of them calves and some horses. (P. 455.) The taxpayer claimed that these figures included 1,175 cows which did not exist. (P. 452.) The court said that under plaintiff's theory, any error in the proper classification of property assessed could be asserted to be an assessment of property not in existence. (P. 461.) The court held that the taxpayer was required to prove not that the assessor was in error in his count, but that he was compelled to pay more taxes than he should have paid.

In the case at bar, we conclude that Taxpayer did not sustain the burden of proof that he paid more tax than he should have paid.

The judgment is affirmed.

Stephens, Acting P. J., and Ashby, J., concurred.

A petition for a rehearing was denied August 13, 1974, and appellant's petition for a hearing by the Supreme Court was denied September 19, 1974. Clark, J., did not participate therein.