(No. 22471.—

THE PEOPLE *ex rel.* R. S. Wangelin, County Collector, Appellee, *vs.* THE ST. LOUIS BRIDGE COMPANY, Appellant.

*Opinion filed June 20, 1934.*

KRAMER, CAMPBELL, COSTELLO & WIECHERT, for appellant.

LOUIS P. ZERWECK, State's Attorney, for appellee.

Mr. JUSTICE HERRICK delivered the opinion of the court:

The county collector of St. Clair county applied for judgment against the property of the appellant in such county for the delinquent taxes assessed against its property for the year 1932. The assessed value of its property was $3,150,000. It paid a tax computed on an assessed valuation of $2,000,000 and filed objections to the remainder of the tax. By its first and seventh objections it alleged that it had paid all the taxes for which it was legally liable; that the assessment against its property was made by the taxing authorities arbitrarily, erroneously, unreasonably and fraudulently; that the valuation fixed upon its property was so excessive as to constitute a fraud upon the rights of the appellant, and that in making the assessment the taxing authorities had unjustly discriminated against the appellant, in violation of section 1 of article 9 of the Illinois constitution and in violation of the fourteenth amendment to the constitution of the United States; that $1,500,000 was an ample assessed valuation for taxation purposes, but that the appellant was willing to pay a tax upon an assessed valuation of $2,000,000. The court overruled the objections, entered judgment against the appellant and ordered its property sold. The appellant prosecutes this appeal.

It was stipulated on the trial that the appellee had made a *prima facie* case; that in each of the years 1931 and 1932 the appellant had filed complaints with the board of review that its property was excessively valued for taxation purposes, had appeared before the board and had presented evidence of a character similar to that introduced on the trial of the present case before the county court, and that it had exhausted its remedies before the board of review.

The property involved is the Illinois portion of the Eads bridge and the real estate owned by the appellant appurtenant to the bridge. Construction of the Eads bridge was commenced in 1868 and completed in 1874. The property of the appellant in St. Louis begins at Third street but does not include the tunnel. The bridge extends east across the Mississippi river. The bridge has two decks. The upper deck is used for pedestrians, vehicular and street car traffic; the lower deck is used by railroad trains. The upper highway continues over the railroad deck until the Illinois shore is reached. There the highway divides and deploys one on each side of the railroad tracks, continuing down to grade at about Fourth street in East St. Louis. The railroad approach extends to about the Relay depot. The total length of the bridge from Third street in St. Louis to the terminus at the Relay depot in East St. Louis is 1.22 miles. The length of the highway approach is 4042 feet. The assessment of the appellant's property upon the basis of which the tax involved was extended was allocated as follows: Land, $354,160; bridge structure, $2,795,840. The appellant owns in St. Clair county 4.77 acres of land in fee. The assessing authorities assessed it upon 8.854 acres, the difference between the two amounts representing overhead rights on streets and alleys in East St. Louis.

The Terminal Railroad Association of St. Louis (hereinafter called the Terminal) operates under lease all of the property of the appellant. This same association operates

about twenty different companies which are all conducted as one system, and comprise the Eads bridge, the Merchants bridge, the Union station at St. Louis, and practically all railroad terminals in both cities. The stock of the Terminal is owned by fourteen trunk line railways, but by decree of the Supreme Court of the United States all railroad companies have access to the Terminal facilities upon as nearly an equal plane as may be, with respect to expenses and charges, as have the proprietary companies. *United States* v. *Terminal Railroad Ass'n,* 224 U. S. 383, 56 L. ed. 810.

The lease under which the Terminal operates the property of the appellant was made many years ago. By the terms of this lease the Terminal guarantees the annual dividends on the first and second preferred stock, amounting to $239,400. It owns all the common stock of the appellant and keeps alive an old bond issue upon which $250,000 accrues yearly but which is never paid, as such payment would be merely a book-keeping entry of the debtor paying to itself as creditor. The appellant's property constitutes one of the component parts of the railroad terminal system in the two cities. There is no fixed charge for the movement of a car over the Eads bridge alone. Any freight or passenger movement over the Eads bridge must use some of the other facilities owned by the Terminal. Because of the different properties utilized in any movement in freight or passenger service and because no allocation of income or costs in connection therewith is made by the Terminal, no separate books of income or expense are kept for the lower deck, and appurtenances thereto, of the Eads bridge.

There has been a marked falling off of income of the Terminal during the last few years. Books are kept of the receipts and charges on the upper roadway on the basis of the valuation and apportionment of the properties between the two States as made by the appraisement, here-

inafter referred to, of the Interstate Commerce Commission (hereinafter called the commission) assigning one-half to Illinois. The net revenue from the upper roadway for the year 1932 and the four years immediately preceding was as follows: For hauling passengers on street cars over the bridge, the gross receipts from the street car company were as follows: 1928, $173,616.50; 1929, $164,271.43; 1930, $138,742.35; 1931, $106,695.17; 1932, $75,843.92; while the net revenues, from all sources, of the highway for the years 1931 and 1932 were, in 1931, $89,859.85, and in 1932, $44,814.15. On the basis of the appraisal of the entire terminal property for rate-making purposes by the commission, the Terminal has assigned six and six-tenths per cent of all net railway operating income of all the terminal properties for the five successive years, beginning with 1928, to the Eads bridge property. The net income for such five-year period was as follows: 1928, $644,892.10; 1929, $440,749.02; 1930, deficit, $582,034.78; 1931, deficit, $803,235.68; 1932, deficit, $1,570,005.47.

Several years ago the Congress of the United States ordered a valuation by the Interstate Commerce Commission of railroad property for rate-making purposes, and also then passed an act (commonly known as the Re-capture act, recently repealed,) by which it was provided, in substance, that railroads shall be limited in their earnings to six per cent upon the valuation of their property so determined, and any excess above such six per cent shall be equally divided between the Federal government and the railroad companies. However, the share of a railroad company in such excess was to be applied only to permanent improvements with the consent of the commission. In accordance with said act an appraisement of all the terminal properties was made as the property existed in 1919. In making such appraisement the commission used the average price for the years 1910-1914. All net additions

to the property were based upon the 1910-1914 costs and added to the original valuation at such figures, and retirements were made upon the same basis. Where betterments and additions were made after 1919, even though prices were then higher, the valuation was fixed on the four-year period. The property of the appellant was appraised separately. The commission found that the original cost of the bridge and its property could not be accurately ascertained, but from the best information available the commission found, after making the re-adjustments required, the actual investment was $10,789,691.91. It found the cost of reproduction, new, without depreciation of that part of the bridge in Illinois, exclusive of the upper deck, was $2,795,572, and after deducting depreciation of seven-tenths of one per cent per annum for forty-five years, the cost of reproduction as of June 30, 1919, exclusive of the upper roadway of the Illinois part of the bridge, was $1,-968,341. The upper roadway was appraised at $619,807, of which $356,283 applies to the Illinois portion. The commission appraised the value of all real estate at $200,042, of which $148,642 was in Missouri and $51,400 in Illinois, and found the value of all property of the appellant as of June 30, 1919, to be $3,446,320. The commission appraised the value in Illinois of the property of the appellant, including the upper highway and exclusive of real estate, as of December 31, 1932, at $2,160,528. Costs as of April 1, 1932, were from twenty to twenty-five per cent higher than the average during the four-year period. This would make the reproduction value, new, depreciated, in Illinois, exclusive of real estate, at the time of the assessment, approximately $2,700,000. The value of the land in Illinois is to be added to this amount in order to get the entire value of the appellant's property in Illinois. The assessors' valuation of actual value of the land, which included not only the fee but the overhead rights over streets and alleys, was $354,160. This is on the basis of $40,000

per acre for 8.854 acres, four and seven-tenths of which are owned in fee, the remainder representing the overhead rights. A qualified witness for the appellant testified that the full cash market value of the land of the appellant was $20,000 per acre. This would make the total fair cash market value, including the overhead rights, $177,080. On the present trial the appellee offered no evidence on the value of the land as apart from the bridge structure. From the evidence of the appellant it is apparent that the fair cash market value of all property in Illinois did not exceed $2,877,080.

On the present hearing but two witnesses testified for the appellee. They were both members of the board of review. One of these testified that the board of assessors assessed the property in 1932 at $3,150,000 and that the board of review concurred in that finding, and that this amount represented forty per cent of the actual value. He testified that they considered income as one of the factors to be considered in fixing the value, but that the board did not have much information on the income. He did admit the board had before it the assessment of the bridge in . Missouri, where assessment is made upon sixty or sixty-five per cent of the actual value, and the valuation placed upon the property by the commission; that the board never had any appraisement of the bridge, but it had taken into consideration its predecessors' valuation and that of the board of assessors. He further testified that a statement of the income from the bridge was attached to the complaint made in 1932. The other member of the board of review testified that a statement of the income was before the board on the hearing on the complaint in 1932; that the value of $3,150,000 of the appellant's property had been on the assessment books for ten, fifteen or twenty years prior to that time, and that the board had assumed the valuation had been reached by deliberation and by consultation with the former boards. The present board of

review had assumed that it was a fair assessment, inasmuch as up to the present time the assessment had not been objected to, or if so, not successfully, except in 1927 on a smaller amount. He testified that he had thought that for 1931 the Eads bridge would show a large amount of railroad revenues, so the board had raised the assessment made in 1931, $500,000 over the previous assessment. He further stated: "We always try to keep up the assessments in St. Clair county and we were guided by the demand. The public demand is the reason we put it on."

A bridge is a type of property in a class by itself. As a completed structure there is practically no market for a bridge across the Mississippi river, so we cannot look to market value as the sole basis for determining the fair cash value of the property in question. However, its reproduction cost is an element and also the earnings of the property, and are of assistance in determining the value of the property. The evidence shows that the Municipal bridge across the Mississippi river was assessed at $2,000,000 for the year 1932 and was reduced on hearing before the county court to a valuation of $1,000,000.

The property in question is but a unit of an integral system. Without the completed system the property would have but little, if any, value. If the earnings of the appellant for 1931 were capitalized at six per cent, that would make a full, actual value of approximately $2,350,000. If the earnings for 1932 were capitalized on the same basis there would be a full, actual valuation of all the property of the appellant of $1,300,000, and if the average earnings for 1931 and 1932 were capitalized at six per cent there would be a full valuation of $1,800,000. The evidence shows that the Missouri part of the bridge was assessed at $1,300,290, and that is upon the basis of a ratio of sixty-five per cent of the actual value. Notwithstanding the statute of our State requiring property of this type of bridge structure and real estate to be assessed at actual

value, the evidence shows that the taxing authorities, in disregard of this statute, have assessed property generally, both real and personal, on a ratio of from thirty-seven per cent to forty per cent of actual value. Section 1 of article 9 of our constitution provides, in substance, that the General Assembly shall provide such revenue as shall be needful by levying a tax by valuation, so that every person or corporation shall pay a tax in proportion to the value of his or its property. The fundamental purpose of this constitutional provision is to secure to the tax-payers an equality and uniformity of taxation according to value, so that property shall be uniformly and equally taxed, without unjust discrimination. The constitution contemplates that every property owner shall pay a tax in accordance with the value of his property, so that the financial burden of the cost of government may be borne ratably and proportionately, in accordance with value. Any different system fails to meet the requirements of the constitution. Such rule must be followed in order to secure to the tax-payer the benefit of the command of the State constitution. Not to do so would in turn be violative of the fourteenth amendment to the constitution of the United States. *People* v. *Wiggins Ferry Co. ante,* p. 173; *People's Gas Light and Coke Co.* v. *Stuckart,* 286 Ill. 164; *Greene* v. *Louisville and Interurban Railroad Co.* 244 U. S. 449, 61 L. ed. 1280; *Sioux City Bridge Co.* v. *Dakota County,* 260 id. 441, 67 L. ed. 340; *Brinkerhoff-Faris Trust and Savings Co.* v. *Hill,* 281 id. 673, 74 L. ed. 1107; *Mobile and Ohio Railroad Co.* v. *Schnipper,* 31 Fed. (2d) 587.

The fact that there may be a difference of opinion as to the value of property between the assessing authorities and the court does not justify interference on the part of the court. However, when the evidence shows that there has been a gross over-valuation, entirely out of proportion to the actual value of the property, so that it is obvious

that the assessment was made by the taxing officers unfairly, deliberately and willfully and in gross defiance of the rights of the property owner, the court will interpose in defense of the tax-payer. (*Pacific Hotel Co.* v. *Lieb,* 83 Ill. 602; *People* v. *Wiggins Ferry Co. supra.*) In a case of excessive over-valuation it is not necessary that intentional fraud be shown, but where the evidence clearly establishes that the assessment was made either in ignorance of the value of the property or not on a judgment based upon readily obtainable facts, or the property was designedly excessively valued, such conduct on the part of the taxing authorities amounts to a constructive fraud. (*People* v. *Stewart,* 315 Ill. 25.) The ratio of not to exceed forty per cent of the fair cash market value of property adopted by the taxing authorities of St.Clair county for the assessment of property must be applied to the property of the appellant. *People* v. *Illinois Central Railroad Co.* 355 Ill. 605; *First Nat. Bank* v. *Holmes,* 246 id. 362; *People's Gas Light and Coke Co.* v. *Stuckart, supra; Mobile and Ohio Railroad Co.* v. *Schnipper, supra.*

We cannot escape the conclusion, as stated by one of the witnesses for the appellee, that the assessment placed upon the appellant's property was the result of the public demand and not the result of a thorough investigation of the actual value of the property. The rights of the individual and of the public cannot be determined according to public clamor and outcry. No administrative board and no court can relieve itself of its duty or obligation to follow the law by yielding to public demand in the administration of the duties intrusted to it. The evidence in the case clearly establishes that the valuation placed upon the appellant's property for taxation purposes was grossly in excess of the fair cash market value of such property, and that such valuation was an arbitrary one, resulting in an unjust and unwarranted discrimination against the appellant in violation of its constitutional rights, and such over-

valuation for taxation purposes amounted to constructive fraud.

The county court erred in overruling the first and seventh objections of the appellant.

The judgment of the county court is reversed and the cause is remanded to that court, with directions to sustain the first and seventh objections of the appellant.

*Reversed and remanded, with directions.*