[L. A. No. 25987. In Bank. May 17, 1962.]

THE MICHAEL TODD COMPANY, INC., Plaintiff and Appellant, v. THE COUNTY OF LOS ANGELES et al., Defendants and Respondents.

686

Shearer & Fields, Jacob Shearer, Bertram Fields and Bernard Shearer for Plaintiff and Appellant.

Loeb & Loeb, Mitchell, Silberberg & Knupp and Hilbert P. Zarky as Amici Curiae on behalf of Plaintiff and Appellant.

Harold W. Kennedy, County Counsel, and Alfred Charles De Flon, Deputy County Counsel, for Defendants and Respondents.

Stanley Mosk, Attorney General, Dan Kaufmann, Assistant Attorney General, and Walter J. Wiesner, Deputy Attorney General, as Amici Curiae on behalf of Defendants and Respondents.

SCHAUER, J.—Plaintiff appeals from a judgment for defendants in an action to recover ad valorem personal property taxes for the year 1957, levied upon an assessment of certain film negatives of the copyrighted motion picture entitled "Around The World In Eighty Days."

This case appears to be the first in which any taxpayer has questioned the validity of the Los Angeles County Assessor's method of assessing motion picture negatives—a method which, the parties agree, has been in use by the assessor for many years. Plaintiff advances a variety of arguments on the theme that the assessment is void because it assertedly includes the value of plaintiff's copyright in the subject negatives. The Association of Motion Picture Producers, as amicus curiae, echoes plaintiff's contentions and extends the attack to the assessor's established method of valuing motion pictures which are in the course of production on the tax lien date. We have concluded that although plaintiff's statement of

relevant principles of copyright law is correct the implications which plaintiff seeks to draw from such principles in the case at bench are unsound as a matter of tax law, and hence that the judgment should be affirmed.

Plaintiff is a Delaware corporation engaged in the business of making motion pictures in this state. On the first Monday in March, 1957, the following film negatives of the motion picture "Around The World In Eighty Days" were owned by plaintiff in Los Angeles County: the original negative, a duplicate or protective master thereof, and the then unassembled components of a second "original" negative and a duplicate or protective master of that negative. Plaintiff was also the holder of the copyright in the motion picture and the negatives.[1]

During the regular assessment period for 1957 the County Assessor assessed the subject negatives as taxable personal property of plaintiff of a cash value of $1,526,900, and ad valorem taxes were levied thereon in the amount of $105,064.46. Plaintiff's application to the Board of Supervisors of Los Angeles County (sitting as a county board of equalization) for cancellation or reduction of the assessment was denied after hearing. Plaintiff thereupon paid the disputed taxes under protest, and instituted the present proceeding to recover the amounts thus paid.[2]

The trial court found that the assessed value was "fair, equitable and nondiscriminatory as compared to assessments by said Assessor of all other motion picture negatives and of motion picture prints"; that this valuation "did not exceed the full cash value" of the negatives; and that the action of the board of supervisors in denying plaintiff's application for relief "was based upon substantial evidence" and "did not constitute fraud upon plaintiff, actual or constructive."

Counsel for defendants stipulated at the trial that "[plaintiff's] interest in the property by reason of having the copyright was considered in determining the value of the property that was assessed"; and that if plaintiff had had no copyright the negatives would have had a "salvage value" of $1,000.

---

[1] In addition, plaintiff owned 28 positive prints of the motion picture which were then being exhibited in the United States and certain foreign countries. There was testimony to the effect that new positive prints could be made from any of the existing prints, but that new positives were not so made because they would be of poor quality.

[2] In the fourth pleaded cause of action plaintiff seeks to recover $3,022.84 in personal property taxes for the year 1956, levied upon an assessment of the subject negatives in an earlier stage of completion.

In accordance with this stipulation the court further found that "Said assessment did not include as such any of the intangible copyright interests which plaintiff had with respect to said motion picture, although the possession by plaintiff of its intangible property interests with respect to the subject motion picture which were created by copyright did cause plaintiff's interests in said negatives and their duplicates to be more valuable than if plaintiff did not own and possess said intangible copyright interests."

Judgment for defendants was entered, and plaintiff appealed.

 Plaintiff's copyright in the motion picture and the negatives is not the so-called "common law copyright" (see Civ. Code, §§ 980-985; *Desny* v. *Wilder* (1956) 46 Cal.2d 715, 740 [37]—741 [38] [299 P.2d 257]; Amdur, Copyright Law and Practice (1936) ch. II; Ball, The Law of Copyright and Literary Property (1944) §§ 4, 15), but the statutory copyright which exists solely by virtue of federal law (U.S. Const., art. I, § 8; U.S.C., tit. 17; *Bobbs-Merrill Co.* v. *Straus* (1908) 210 U.S. 339, 346 [28 S.Ct. 722, 52 L.Ed. 1086]; *Wheaton* v. *Peters* (1834) 33 U.S. (8 Pet.) 591, 661 [8 L.Ed. 1055]). Yet like the common-law right, plaintiff's copyright is intangible property wholly distinct from any property interest that plaintiff may have in the material object copyrighted. (17 U.S.C. § 27; *Stevens* v. *Gladding* (1854) 58 U.S. (17 How.) 447, 452-453 [15 L.Ed. 155]; *Stephens* v. *Cady* (1852) 55 U.S. (14 How.) 528, 530-531 [14 L.Ed. 528]; *Werckmeister* v. *Springer Lithographing Co.* (C.C.N.Y., 1894) 63 F. 808, 810-812; *Capitol Records, Inc.* v. *Mercury Record Corp.* (S.D.N.Y. 1952) 109 F.Supp. 330, 338-339 [5, 6]; *Remick Music Corp.* v. *Interstate Hotel Co. of Nebraska* (D.C. Neb. 1944) 58 F.Supp. 523, 535 [11, 12]; *National Geographic Soc.* v. *Classified Geographic, Inc.* (D.C.Mass. 1939) 27 F. Supp. 655, 660 [5]; *Davenport Quigley Expedition* v. *Century Productions* (S.D.N.Y. 1937) 18 F.Supp. 974, 977 [4, 5]; cf. *Italiani* v. *Metro-Goldwyn-Mayer Corp.* (1941) 45 Cal.App. 2d 464, 467 [1] [114 P.2d 370].)

 The nature and extent of plaintiff's interests created by copyright, and the manner in which those interests may be transferred, are determined by federal law. (Cf. *Loew's Inc.* v. *Superior Court* (1941) 18 Cal.2d 419, 424-425 [3] [115 P.2d 393].) But there is nothing in the federal statute or in federal constitutional principles which renders such prop-

erty interests immune from state taxation. (*Fox Film Corp.* v. *Doyal* (1932) 286 U.S. 123 [52 S.Ct. 546, 76 L.Ed. 1010]; accord, *Stone* v. *Stapling Machines Co.* (1954) 221 Miss. 555 [73 So.2d 123, 125-127 [1]].) It follows that we must look to the law of California to determine the validity of the assessment here challenged.

Article XIII, section 1, of our Constitution lays down the general mandate that "All property in the State except as otherwise in this Constitution provided, not exempt under the laws of the United States, shall be taxed in proportion to its value, . . ." Section 14 of the same article provides in relevant part that "The Legislature shall have the power to provide for the assessment, levy and collection of taxes upon all forms of tangible personal property, all notes, debentures, shares of capital stock, bonds, solvent credits, deeds of trust, mortgages, and any legal or equitable interest therein, not exempt from taxation under the provisions of this Constitution, . . ." Section 111 of the Revenue and Taxation Code states that " 'Intangibles' means intangible personal property of a type not exempt from taxation and any interest therein. 'Intangible personal property' means only notes, debentures, shares of capital stock, bonds, solvent credits, deeds of trust, and mortgages." And section 212 of that code provides that "Notes, debentures, shares of capital stock, bonds, deeds of trust, mortgages, and any interest in such property are exempt from taxation."

In *Roehm* v. *County of Orange* (1948) 32 Cal.2d 280, 284 [1]—290 [5] [196 P.2d 550], we considered at some length the just-quoted constitutional and statutory provisions. With respect to section 111 of the Revenue and Taxation Code we held (*id.* at p. 285 [2]) that "Emanating from a Legislature vested [by Const., art. XIII, § 14] with the power to exempt from taxation all kinds of personal property, it [Rev. & Tax. Code, § 111] makes immune from taxation all intangibles not included in the statutory definition." After reviewing the purposes underlying the 1933 amendments to section 14, article XIII (quoted hereinabove) we concluded (*id.* at p. 289 [4]) that "The only intangibles (except franchises, which are in a class by themselves) subject to taxation under the present system of property taxation in this state are solvent credits, . . . All other types of intangible assets specified in section 14 of article XIII of the Constitution, as amended, and section 111 of the Revenue and Taxation Code are exempted from taxation by section 212 of that code and

are therefore not part of the taxable personal property in this state.''

■ It is manifest that none of the intangible property interests created by copyright is a solvent credit. Accordingly, plaintiff's copyright in the motion picture and the negatives may not be subjected to ad valorem property taxation under the present constitutional and statutory law of this state. Indeed, copyrights are among the intangible rights and privileges which, as we observed in *Roehm* (p. 283 of 32 Cal.2d), ''have never been taxed as property in this state during its entire existence. . . .''

The foregoing proposition, however, is not of itself dispositive of the case at bench. ■ First, while conceding that plaintiff's copyright *as such* may not be taxed, defendants take the position that the interest of plaintiff here assessed is simply its ''right to use the negatives'' to make distribution prints of the motion picture. Defendants reason that this right is a ''right to use a physical, tangible object'' of personalty; that such a right is itself ''a species of tangible property''; and that such property is not ''transformed'' into an intangible merely by reason of being ''protected'' by federal copyright law. Defendants conclude that ''when the personality is privately owned such right of user is fully assessable and taxable.''

The argument misconceives the nature of copyright. To begin with, defendants confuse the *physical ability* to use the subject negatives for making distribution prints with the *legal right* to do so. In effect, defendants confuse the use of the physical means of reproducing the copyrighted object with the use of the copyright itself. Defendants assume that the right to use the negatives for this purpose is identical with the right of an owner to make lawful use of any tangible property in his possession, and cite as example the right of the owner of a horse to ride his animal. But in so reasoning defendants overlook the fact that the two types of rights—the right to copy and the right to use tangible property in general—have different historical origins and have consistently received different legislative and judicial treatment. The right to ride one's horse is an attribute of the ownership of the horse itself; and he who owns the material object ordinarily has both the physical ability and the legal right to use it for any lawful purpose. (Cf. Keesling, *Conflicting Concepts of Ownership in Taxation* (1956) 44 Cal.L.Rev. 866, 872-873.) But the legal right to make copies of copyrighted material

derives from the copyright statute alone and has never been deemed an attribute of the ownership of that material or of the physical means of its reproduction.

Thus, in *Stevens* v. *Gladding* (1854), *supra,* 58 U.S. (17 How.) 447, a copper plate bearing the engraving of a copyrighted map had been seized and sold on execution of a money judgment against the copyright owner, and the purchaser of the map had used it to print copies of the map which he then offered for sale. The copyright owner sought an injunction to restrain further use of the plate and publication of the map. The purchaser argued that "whenever the owner of a copyright of a map causes a plate to be made which is capable of no beneficial use except to print his map, he thereby annexes to the plate the right to use it for printing that map, and also the right to publish and sell the copies when printed." (*Id.* at p. 450.) In directing entry of the decree prayed for, the United States Supreme Court rejected this argument, reasoning that (*id.* at p. 452) "The sale of a copperplate passes the right to such lawful use thereof as the purchaser can make, by reason of the ownership of the thing he has bought; *but not the right to a use thereof, by reason of the ownership of something else which he has not bought,* and which belongs to a third person. If he has not acquired a press, or paper, or ink, he cannot use his plate for printing, because each of these kinds of property is necessary to enable him to use it for that purpose. So, *if he has not acquired the right to print the map, he cannot use his plate for that purpose,* because he has not made himself the owner of something as necessary to printing as paper and ink, or as clearly a distinct species of property as either of those articles." (Italics added.) (See also *Stephens* v. *Cady* (1852), *supra,* 55 U.S. (14 How.) 528, 530-531.)

Similarly, in a case where the Czechoslovakian government had confiscated the matrices of certain phonograph records and had subsequently licensed them for use by an American recording company, it was held that "no more than a property right in the matrices themselves" was acquired by that government and its licensee, and that "the possession of the matrix did not carry with it the right to the performance, which was with Telefunken [the copyright owner] in Berlin. The right to reproduce the performances engraved on the matrices was intangible. . . ." (*Capitol Records, Inc.* v. *Mercury Record Corp.* (S.D.N.Y., 1952), *supra,* 109 F.Supp. 330, 338—339 [5, 6].) And in a case where the copyright owner

delivered the negative and a positive print of a motion picture to a purchaser under a bill of sale conveying "all my right, title and interest to and in" such film, it was held that no copyright passed to the purchaser by virtue of his acquiring title to the film. (*Davenport Quigley Expedition* v. *Century Productions* (S.D.N.Y. 1937), *supra,* 18 F.Supp. 974, 977 [4, 5].)

In its present form the copyright statute explicitly provides (17 U.S.C. § 27) that "The copyright is distinct from the property in the material object copyrighted, and the sale or conveyance, by gift or otherwise, of the material object shall not of itself constitute a transfer of the copyright, nor shall the assignment of the copyright constitute a transfer of the title to the material object; . . ."

 In the light of these authorities it would appear that plaintiff's right to use the subject negative to make distribution prints is intangible property and hence, under our holding in *Roehm* v. *County of Orange* (1948), *supra,* 32 Cal.2d 280, 289 [4], could not *as such* be subjected to ad valorem property taxation.

Plaintiff's principal contention is that defendants may not do indirectly that which they are forbidden to do directly; i.e., that defendants may not levy an "indirect property tax" on this intangible right by "including its value in the assessment of separate and distinct tangible property in which the intangible does not inhere."

 In *Roehm* v. *County of Orange* (1948), *supra,* 32 Cal. 2d 280, 285 [2], we stated, "Intangible values, however, that cannot be separately taxed as property may be reflected in the valuation of taxable property. Thus, in determining the value of property, assessing authorities may take into consideration earnings derived therefrom, which may depend upon the possession of intangible rights and privileges that are not themselves regarded as a separate class of taxable property. [Citations.]" Seeking to limit the scope of this language, plaintiff proposes a distinction between intangible rights which "inhere" in tangible property and intangible rights which do not thus "inhere"; the latter, plaintiff says, were not intended by this court to be included among the "Intangible values . . . that . . . may be reflected in the valuation of taxable property." (*Ibid.*) To determine which intangible rights "inhere" in tangible property for tax purposes, plaintiff then turns to the rule that all taxable property in this state must be assessed "at the price that property would

bring to its owner if it were offered for sale on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other.'' (*De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 562 [6a] [290 P.2d 544].) On this basis plaintiff argues that only those rights which would pass to a hypothetical willing buyer of tangible property under the *De Luz* rule may be considered in the valuation of that property for tax purposes, and that under settled principles of copyright law the right to use the subject negatives for making distribution prints would not pass to a purchaser of the negatives alone.

The propriety of including nontaxable intangible values in the valuation of otherwise taxable property has been asserted by the courts in a variety of contexts. (See, e.g., *Adams Express Co.* v. *Ohio State Auditor* (1897) 165 U.S. 194, 220-222 [17 S.Ct. 305, 41 L.Ed. 683]; *Ewert* v. *Taylor* (1916) 38 S.D. 124 [160 N.W. 797, 801 [2-3]]; *Council of Newark* v. *Claringbold* (1914) 28 Del. 133 [90 A. 1130]; *State ex* rel. *Attorney General* v. *Halliday* (1899) 61 Ohio St. 352 [56 N.E. 118, 123-124]; and compare *Stein* v. *Mayor etc. of Mobile* (1850) 17 Ala. 234, 240-242, with *Town of Orange* v. *City of Barre* (1921) 95 Vt. 267 [115 A. 238, 240 [6]].)[3] In the case at bench, however, we need not undertake to explore the ramifications of this rule or to circumscribe our quoted language from *Roehm* v. *County of Orange* (1948), *supra,* 32 Cal.2d 280, 285 [2]. The real issue in this case is not whether, as an abstract question of the effect of copyright principles upon the power to tax, intangible values which do not ''inhere'' in tangible property may as a matter of law be included in the valuation of that property, Rather, in proceedings of this nature the issue before the trial court is whether the county board of equalization ''has proceeded arbitrarily and in willful disregard of the law intended for their guidance and control, with the evident purpose of imposing unequal burdens upon certain of the taxpayers . . . or . . . [whether] there be something equivalent to fraud in the action of the board'' (*McClelland* v. *Board of Supervisors* (1947) 30 Cal.2d 124, 129 [1] [180 P.2d 676]; accord, *City of*

---

[3]With respect to state taxation of privately leased federal property, compare *United States* v. *Allegheny County* (1944) 322 U.S. 174 [64 S.Ct. 908, 88 L.Ed. 1209], with *City of Detroit* v. *Murray Corp. of America* (1958) 355 U.S. 489 [78 S.Ct. 458, 486, 2 L.Ed.2d 441, 460]; *United States* v. *City of Detroit* (1958) 355 U.S. 466 [78 S.Ct. 474, 486, 2 L.Ed.2d 424, 460]; and *United States* v. *Township of Muskegon* (1958) 355 U.S. 484 [78 S.Ct. 483, 486, 2 L.Ed.2d 436, 460].

*Los Angeles* v. *County of Mono* (1959) 51 Cal.2d 843, 851 [7-8] [337 P.2d 465]; *De Luz Homes, Inc.* v. *County of San Diego* (1955) *supra,* 45 Cal.2d 546, 564 [16], and cases there cited). Hence the issue on this appeal is whether the evidence supports the trial court's findings (quoted hereinabove) to the effect that the assessment of the subject negatives was nondiscriminatory and did not constitute actual or constructive fraud on plaintiff.[4]

On the issue of nondiscrimination the trial court expressly found that "Said methods of computing the full cash value of plaintiff's said negatives and duplicate negatives [quoted at fn. 5, *post,* and accompanying text] are the same methods which were generally used by the Assessor in 1957 in assessing all other motion picture negatives." It is enough to point out that plaintiff offered little or no evidence on this issue, and does not challenge the just-quoted finding.

The standard of valuation prescribed by the Legislature is that "all taxable property shall be assessed at its full cash value." (Rev. & Tax. Code, § 401.) "Full cash value" is defined (*id.,* § 110) as "the amount at which property would be taken in payment of a just debt from a solvent debtor." This value, we have said, "might be called the market value of property for use in its present condition." (*De Luz Homes, Inc.* v. *County of San Diego* (1955), *supra,* 45 Cal.2d 546, 562 [6a].)

Relying on *De Luz,* plaintiff contends that "the test which must be applied in evaluating the motion picture negative here is what a willing buyer would pay for the uses to which *he* could put the negative, without consideration of the uses to which it could be put by its present owner who may also happen to own the copyright." Plaintiff reasons that this hypothetical willing buyer "would pay very little for the negative itself [i.e., without the copyright] and . . . this small amount is the only proper sum which can be attributed to the

---

[4]For the same reason we need not reach (1) plaintiff's alternative argument that our above-quoted language from *Roehm* is inapplicable "because film, as assessed here, is in itself 'intangible' for purposes of taxation"; nor (2) plaintiff's contention that its copyright as such could not be taxed by defendants because it had "no taxable situs in the State of California."

Moreover, when the issue is thus seen in its proper light it is apparent that, contrary to plaintiff's view, the decision reached today will not conflict with the Attorney General's Opinion NS 3208 (1941) (receipts from distribution of motion pictures are "royalties" for purposes of Personal Income Tax Act) or with Sales Tax Ruling 19 (18 Cal. Admin. Code, § 1929) (motion picture producers are "consumers" of film for purposes of sales and use tax).

physical film for tax purposes." Plaintiff concludes that the "market value" of the subject negatives was therefore the $1,000 salvage value to which the parties stipulated at the trial.

The argument, although ingenious, is logically unsound. ▉ It is true that, as a matter of copyright law, the right to make distribution prints would not be acquired by one who purchased the subject negatives without the copyright. But it does not follow, as plaintiff contends, that *as a matter of tax law* the "market value" of the negatives—which cost some $5,000,000 to produce and had a potential earning power of many millions of dollars—was simply their salvage or scrap value of $1,000. The record establishes, rather, that for the purpose of determining "full cash value" there was *no actual market* for the subject negatives without plaintiff's copyright therein. The sole beneficial or productive use of the negative film of a motion picture is for making prints thereof for exhibition, whether such prints be sold or leased. Indeed, plaintiff acknowledges that in the present case "a buyer of the negative would get no right to use the property *in any manner having any substantial value.*" (Italics added.)

▉ But "market value" for assessment purposes is the value of property when put to beneficial or productive use; it is not merely whatever residual value may remain after the property is demolished, melted down, or otherwise reduced to its constituent elements. (Cf. *Mahoney* v. *City of San Diego* (1926) 198 Cal. 388, 399 [5]—402 [7] [245 P. 189].) In the event that the beneficial or productive use of the property would not pass to a willing buyer on an open market, the assessor must treat the property as having no actual market for valuation purposes.

▉ However, as we further stated in *De Luz Homes, Inc.* v. *County of San Diego* (1955), *supra,* 45 Cal.2d 546, 563 [14], "It is well settled that 'the absence of an "actual market" for a particular type of property does not mean that it has no value or that it may escape from the constitutional mandate that "all property . . . shall be taxed in proportion to its value" (Art. XIII, § 1) but only that the assessor must then use such pertinent factors as replacement costs and income analyses for determining "valuation." ' (*Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 623 [184 P.2d 879].)" (Accord, *Natatorium Co.* v. *Board of Com'rs of Ada County* (1946) 67 Idaho 143 [174 P.2d 936, 939 [3]] ; *State* ex rel. *Intl. Business Machines Corp.* v. *Board of Review of City of Fond du Lac*

(1939) 231 Wis. 303 [285 N.W. 784, 789 [8-9]] ; *People* ex rel. *Wangelin* v. *St. Louis Bridge Co.* (1934) 357 Ill. 245 [191 N.E. 300, 303 [1]] ; *Underwood Typewriter Co.* v. *City of Hartford* (1923) 99 Conn. 329 [122 A. 91, 94 [5, 6]] ; *Essex Co.* v. *City of Lawrence* (1913) 214 Mass. 79 [100 N.E. 1016, 1018 [3, 4]].)

▮ Tested by this rule, the method of valuation here employed by the Los Angeles County Assessor was proper. The trial court found, and plaintiff does not question the sufficiency of the evidence to support the finding, that the assessor used two different methods in computing the valuation of the subject negatives: i.e., "Using the first method the Assessor subtracted from the production cost of the negatives and their duplicates a fraction thereof equal to the number of distribution prints manufactured as of the first Monday of March, 1957, divided by the Assessor's estimate of the total number of distribution prints to be made from the negatives. . . . The second method used by the Assessor, to check upon and substantiate the assessed value computed by the first method, was to subtract from the production cost of the negatives and their duplicates, a fraction of such cost equal to actual monetary distribution returns as of the first Monday of March, 1957, divided by the Assessor's estimate of total expected monetary distribution returns."[5] ▮ As we observed in *De Luz Homes, Inc.* v. *County of San Diego* (1955), *supra,* 45 Cal.2d 546, 563—564 [15], "Assessors generally estimate value by analyzing market data on sales of similar property, replacement costs, and income from the property [citations], and since no one of these methods alone can be used to estimate the value of all property, the assessor, subject to requirements of fairness and uniformity, may exercise his discretion in using one or more of them."

▮ It is true, as plaintiff emphasizes, that the *standard* of valuation prescribed by statute is "full cash value" rather than cost per se. But in proper circumstances cost may serve as a point of departure from which the assessor may proceed to determine "full cash value." ▮ While the use of production cost for this purpose (rather than "replacement cost") has been criticized (see 1 Bonbright, The Valuation of Property, pp. 140-149), we are not committed to the view that the former figure must automatically be excluded from consideration. Thus, in *Mahoney* v. *City of San Diego* (1926),

---

[5] Each resulting figure "was then reduced 30 per cent and the remaining balance then multiplied by 50 per cent to produce the assessed value."

*supra,* 198 Cal. 388, 402 [7], this court described "cost of construction" as one of the "elements which in common experience ordinarily determine values" for assessment purposes; and in *Kaiser Co.* v. *Reid* (1947), *supra,* 30 Cal.2d 610, 623 [8], we quoted with approval language of the Connecticut court (*Underwood Typewriter Co.* v. *City of Hartford* (1923), *supra,* 122 A. 91, 94 [5, 6]) suggesting a method of valuation based on "the original cost of construction and improvements. . . ." Under normal conditions, of course, the shorter the lapse of time between construction and assessment, the more closely actual construction cost will correspond to estimated "replacement cost." Here the production cost of the property had but recently been incurred, and plaintiff failed to show that a hypothetical "replacement cost" figure would be substantially different from the actual cost of production. While we do not imply that use of the latter cost figure would in all instances be sound assessment practice, in the present case the assessor in the exercise of his discretion could properly consider the production cost of the subject negatives as a substantial element in estimating their taxable value.

Accepted appraisal theory requires that a deduction for "depreciation" be made from the valuation basis chosen. "[T]he depreciation factor must be taken into account in a valuation based on actual sales, on original cost, on capitalized earnings, or on any alternative basis." (1 Bonbright, *op. cit. supra,* p. 177.)[6] Here the assessor properly applied such a depreciation factor by reducing, for the purposes of his appraisal, the production cost of the negatives and their duplicates by a fraction equal to the number of distribution prints already made (or income therefrom already received) divided by the estimated total number of prints to be made (or estimated total income to be received). In this manner he recognized and gave effect to the fact that the value of the negatives had steadily decreased as positive prints were made therefrom and distributed for showing.

Plaintiff stresses the fact that (as noted *ante,* fn. 1) positive prints of the motion picture could have been made (although of poor quality) from any of the existing prints without further use of the subject negatives. Plaintiff urges that in view

---

[6]The author gives the following example: "when the present value of a 2-year-old building is to be inferred from its actual construction cost, account must be taken of any depreciation in value that has occurred during the intervening period." (*Ibid.*)

of this fact it could not be said "that any substantial part of the value of the total motion picture lies in the negative. ..."[7] The argument distorts reality, as the "full cash value" of the original negative was manifestly far in excess of its value as a means merely of producing one positive print from which poor quality prints could have been made for exhibition.

For the reasons stated above the judgment is affirmed.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., White, J., and Dooling, J. concurred.

[7]This argument is also at the base of plaintiff's additional contention that the trial court erred in sustaining an objection to plaintiff's examination of the deputy assessor with respect to whether, in making the assessment here challenged, he intended to assess only the original negative or to assess also the duplicate "original" negative and the protective masters of each. Plaintiff somewhat cryptically urges that "Since any of these properties could have been used to make prints without any further use of the first original negative, it is wholly illogical that any substantial value could be assigned to the literary property."