[Civ. No. 1913. Fifth Dist. Sept. 12, 1974.]

WESTERN TITLE GUARANTY COMPANY,
Plaintiff and Appellant, v.
COUNTY OF STANISLAUS et al., Defendants and Respondents.

## COUNSEL

Stockton & Schrimp and Cleveland Stockton for Plaintiff and Appellant.

James E. Merritt, Richard S. Kinyon and Morrison, Foerster, Holloway, Clinton & Clark as Amici Curiae on behalf of Plaintiff and Appellant.

T. W. Martz, County Counsel, Jonathan H. Rowell and John F. Christensen, Senior Deputy County Counsel, and Harry P. Drabkin, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**STONE, J.**\*—Appellant, Western Title Guaranty Company, filed a complaint in the Superior Court of Stanislaus County to recover taxes paid under protest. The court denied appellant relief and this appeal followed.

Appellant is a title company engaged in business in the City of Modesto in the County of Stanislaus. The company gives opinions concerning the title to a particular parcel of real property upon which a certificate of title insurance issues. Its opinion is largely derived from its "title plant" which consists of the title records of the various parcels of real property in Stanislaus County dating back to 1951. The official records containing the title information are varied, such as the records of the county clerk, tax assessor, tax collector, and particularly, the county recorder. Searching the title to

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

a particular parcel of property may be a painstaking and time-consuming chore taking the searcher from office to office and from record book to record book. By consolidating and indexing all of this material in one place, the title condition of any particular lot or parcel can be easily, quickly and readily ascertained from the title company records.

Respondent County of Stanislaus assessed appellant's title plant at a full cash value of $100,000 for the year 1969. This resulted in an assessed value of $20,000. There were no comparable sales known to the assessor, and consequently no known actual market. For this reason the assessor used the cost approach method of arriving at a $100,000 value assessment. He took the initial $54,793.20 cost of establishing the plant. To this he added the estimated annual cost of additions to the plant which appellant's books indicated was $15,000 per year. However, one-half of this was replacement cost. After deducting this, the assessor estimated the other one-half, or $7,500, augmented the value by that amount, or $7,500 per year. The plant had been in operation for six years by 1969, resulting in an increased value of $45,000 which, when added to the initial cost of $54,793.20, resulted in a full cash value of $99,793.20, rounded off to $100,000.

In addition to the 1969 valuation of appellant's title plant, the assessor levied escape assessments for the fiscal years 1965-1968, reaching his valuation of the plant for those years by the method described above.

Appellant paid the assessed taxes and installments under protest and filed a timely application for a reduction with the board of supervisors sitting as a board of equalization. After a hearing by the board, findings of fact were entered approving the assessor's valuation of appellant's personal property, including the title plant.

In its protest accompanying payment of the taxes appellant stated as its grounds for protest that: "1. The assessment includes my title plant which is non-taxable, and therefore erroneous, illegal and void. 2. The escape assessments for 1965, 1966, 1967 and 1968 are erroneous, illegal and void, include non-taxable property, and are actually not an escape assessment. 3. The Assessor's valuation is erroneous, illegal and void for the annual assessment, as well as for the escape assessment, because of the basis of computation." The application to the board of supervisors for hearing was essentially the same. Plaintiff's complaint to recover taxes paid under protest, although essentially the same as the payment under protest on the application for reduction and assessment and hearing before the board of supervisors, is more specific in that appellant alleged that

the assessments "were illegal and void by reason of the fact that the said title plant is intangible personal property and therefore not subject to taxation under provisions of the Revenue and Taxation Code of the State of California."

Appellant's basic contention is that its records, which were taken from the public records, are intangible property and that the records, as such, are taxable only for their physical worth which would be scratch paper. We believe that when viewed in the light of Revenue and Taxation Code section 6016, which defines tangible as follows: " 'Tangible personal property' means personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses," the information contained on the records of appellant's title plant is intangible property. Furthermore, as appellant points out, the Supreme Court in *Roehm* v. *County of Orange,* 32 Cal.2d 280, 284-285 [196 P.2d 550], declared that all forms of intangible personal property other than those specified in article XIII, section 14 of the Constitution, i.e., "notes, debentures, shares of capital stock, bonds, solvent credits, deeds of trust, mortgages, and any legal or equitable interest therein" were exempt from taxation. Thus, it would appear at first blush that only the paper, cards and books upon which appellant's records are maintained are taxable personal property, while the information compiled and indexed upon such physical documents, being intangible, is not taxable. But the Supreme Court, in *Roehm* v. *County of Orange, supra,* also stated, at page 285, "[i]ntangible values, however, that cannot be separately taxed as property may be reflected in the valuation of taxable property. Thus, in determining the value of property, assessing authorities may take into consideration earnings derived therefrom, which may depend upon the possession of intangible rights and privileges that are not themselves regarded as a separate class of taxable property. [Citations.]" In a later case, *Michael Todd Co.* v. *County of Los Angeles,* 57 Cal.2d 684 [21 Cal.Rptr. 604, 371 P.2d 340], the Supreme Court reaffirmed this view where it said at page 694, "The propriety of including nontaxable intangible value in the valuation of otherwise taxable property has been asserted by the courts in a variety of contexts. (See, e.g., *Adams Express Co.* v. *Ohio State Auditor* (1897) 165 U.S. 194, 220-222 [17 S.Ct. 305, 41 L.Ed. 683, 695-696]; *Ewert* v. *Taylor* (1916) 38 S.D. 124 [160 N.W. 797, 801 [2-3]]; *Council of Newark* v. *Claringbold* (1914) 28 Del. 133 [90 A. 1130]; *State* ex rel. *Attorney General* v. *Halliday* (1899) 61 Ohio St. 352 [56 N.E. 118, 123-124]; and compare *Stein* v. *Mayor etc. of Mobile* (1850) 17 Ala. 234, 240-242, with *Town of Orange* v. *City of Barre* (1921) 95 Vt. 267 [115 A. 238, 240 [6]].)" (Fn. omitted.)

The *Todd* case presents an interesting discussion of a tax question which is in many ways analogous to the case at bench. In *Todd* the Los Angeles County Assessor placed a cash value of $1,526,900 on the film negatives of the motion picture "Around the World in Eighty Days." Plaintiff, who owned the original negative and a duplicate or protective master thereof, also owned the copyright of the film. Todd contended that the film, as physical personal property, had a value of $1,000 to which the county stipulated. Since no one could use the master negative to make prints without owning the copyright, and since a copyright is intangible personal property and nontaxable, Todd contended that the tax had to be predicated upon a market value of $1,000. But the court determined that assessing authorities may take into consideration earnings derived from intangible rights and privileges that are not themselves regarded as a separate class of taxable property and thus be reflected in the valuation of the taxable property. If we apply the principle of production value or earning value to the information contained in appellant's title records upon which it bases an opinion as to the condition of the title of a parcel of real property, which opinion in turn supports the issuance of a certificate of title insurance, we see little difference between this case and the *Todd* case.

During the pendency of this appeal, the Legislature enacted an urgency statute which is pertinent to the foregoing discussion. Section 997 was added to the Revenue and Taxation Code effective with respect to assessments for the 1973-1974 fiscal year (Stats. 1973-1974, ch. 456, pp. 869-871). We quote the pertinent parts of the act. Section 1, subdivision (a), of the act provides: "(a) The cash value of records of persons engaged in a business or profession for purposes of this division is the cash value only of the tangible material upon which, or in which, such records are recorded, maintained or stored. Such cash value shall be determined without inclusion of or consideration of the intangible value of the information or data so recorded, maintained or stored, nor the intangible right to utilize such information or data." Subdivision (b) of section 1 of the act reads as follows: "(b) As used in this section 'records' includes all written documents and photographic reproductions thereof, recorded data, research notes, calculations, and indices maintained or utilized by persons engaged in a business or profession."

Section 2 of the act provides a method by which the state is to "appropriate funds for subventions for the loss of revenue resulting from the classification of property by Section 1 of this act." Providing reimbursement to local political entities for the loss of revenue derived from being deprived of the authority to assess records such as those in the case at bench

clearly implies that the Legislature considered such records taxable. Moreover, the act is in essence a moratorium which recognizes the taxability of such records in that section 3 of the act reads: "Section 1 of this act shall be operative with respect to assessments for 1974-75 fiscal year to the 1978-79 fiscal year, inclusive, and as of such date is repealed, unless a later enacted statute, which is chaptered before March 1, 1979, deletes or extends such date."

Thus the enactment of Revenue and Taxation Code section 997 strengthens our conclusion that the records of appellant were subject to an ad valorem tax during the tax years 1965-1969.

Appellant also attacks the assessment upon the ground the law prescribes assessment of property at its full cash value which has been equated by the courts with "market value." The market value of its records, appellant argues, is that of scrap paper as there is no ready market for the records and the information they contain. As we have noted, appellant relies upon the reports of its researchers which are made largely from the records in issuing a policy of title insurance. It is the insurance that is sold. As to the kind of argument appellant makes, the Supreme Court stated in the *Todd* case, *supra,* "But 'market value' for assessment purposes is the value of property when put to beneficial or productive use; it is not merely whatever residual value may remain after the property is demolished, melted down, or otherwise reduced to its constituent elements. [Citation.] In the event that the beneficial or productive use of the property would not pass to a willing buyer on an open market, the assessor must treat the property as having no actual market for valuation purposes." (57 Cal.2d 684 at p. 696.) But, said the court, quoting from *De Luz Homes, Inc.* v. *County of San Diego,* 45 Cal.2d 546, 563 [290 P.2d 544], " 'It is well settled that "the absence of an 'actual market' for a particular type of property does not mean that it has no value or that it may escape from the constitutional mandate that 'all property . . . shall be taxed in proportion to its value' (Art. XIII, § 1) but only that the assessor must then use such pertinent factors as replacement costs and income analyses for determining 'valuation.' " [Citation.]' " (57 Cal.2d at p. 696.)

Appellant concedes that there was no actual market for the assessor to use in assessing records of this kind. But, it contends, the assessor did not follow the language of *De Luz Homes* by using the factors "replacement costs and income analyses." Rather, the assessor used what is known as the "cost approach." Appellant asserts that contrary to the finding of the board and the superior court, the use of the cost approach method was both arbitrary and an abuse of discretion. A somewhat similar argument

was advanced in the *Todd* case and the Supreme Court said: "It is true, as plaintiff emphasizes, that the *standard* of valuation prescribed by statute is 'full cash value' rather than cost per se. But in proper circumstances cost may serve as a point of departure from which the assessor may proceed to determine 'full cash value.' While the use of production cost for this purpose (rather than 'replacement cost') has been criticized (see 1 Bonbright, The Valuation of Property, pp. 140-149), we are not committed to the view that the former figure must automatically be excluded from consideration." (57 Cal.2d at p. 697.) (See also *Mahoney* v. *City of San Diego,* 198 Cal. 388, 402 [245 P. 189]; *Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 623 [184 P.2d 879].)

The assessor here used appellant's original or initial cost and for each year of operation added one-half of the $15,000 cost of yearly additions to the records. Appellant asserts that the production cost method of value determination requires a deduction for depreciation. But we note that the auditor testified that one-half of the $15,000 annual cost of maintaining the records and of adding to the records was deducted, that is, not added to the cash or market value because one-half of the cost was duplication or replacement cost which did not add to the value. Consequently, depreciation was reflected in the reduction of $7,500 from the annual $15,000 cost as replacement and maintenance expense. ■ Even so, depreciation is not an inflexible factor in the cost approach formula for determining value. Application of the formula depends in part upon the kind of property that is being valued. The tax assessor testified that land title records do not depreciate in the same manner as much other property does. On the contrary, their value increases as the transactions affecting title increase year by year. The intrinsic value lies in the indexing and the currency of the records which eliminates a costly and time-consuming search of the official records of the county, item by item, each time a title search is ordered for a particular parcel of property.

In regard to value, two things are significant. First, appellant has not demonstrated that the method used by the assessor has resulted in an over-assessment of its property. The thrust of its assessment argument is that the subject matter of its records is not taxable as a matter of law. Second, the board's decision "in regard to specific valuations and the methods of valuation employed [is] equivalent to the findings and judgment of a trial court and reviewable only for arbitrariness, abuse of discretion, or failure to follow the standards prescribed by the Legislature." (*De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, 564; *County of Riverside* v. *Palm-Ramon Development Co.,* 63 Cal.2d 534, 538 [47 Cal.Rptr.

377, 407 P.2d 289].) ▮ We conclude that under the facts of this case the assessor acted within his discretion in the method used to establish the assessed value of appellant's title records and that he did not act arbitrarily nor violate any standards prescribed by the Legislature.

Appellant lays considerable stress on alleged discrimination in the assessing of its records as contrasted with those of another title company in the county and, particularly, because the business records of other kinds of businesses were assessed differently. In its brief, appellant specifically mentions "the records and indices of credit bureaus, newspaper morgues, accountants, dentists, physicians, prescription files of pharmacists, insurance agents, engineers, surveyors, and a myriad of other similar businesses."

Discrimination is basically a question of valuation, and valuation in the assessing process is primarily a question of fact. It is not the fact that no tax was levied as appellant stresses, but how the assessor arrived at the conclusion that certain records did or did not have a taxable or cash value. Appellant's basic position is that the material contained in its records is intangible property and therefore its records are not subject to an ad valorem tax. But, argues appellant, if this point is not well taken, then the intangible substance of all other business records, such as those enumerated, is likewise taxable. But the proposition cannot be settled in such a summary manner; the sole question is not whether the substance of business records is intangible property. ▮ As we learned from *Roehm* v. *County of Orange, supra,* and *Michael Todd Co.* v. *County of Los Angeles, supra,* intangible values that cannot be separately taxed as property may be reflected in the valuation of taxable property. ▮ As noted above, the propriety of including nontaxable intangible values in the valuation of otherwise taxable property has been asserted by the courts in a variety of contexts, and market value for assessment purposes is the value of property when put to beneficial or productive use. ▮ The use to which other businesses put their intangible records, if any, was not explored before the board of equalization. How values as to other business records were arrived at was never in issue because appellant did not raise the issue in its protest accompanying payment of the taxes. Nor did appellant raise the question in its application for an assessment hearing before the board or in its complaint to recover taxes paid under protest or in the pretrial statement. It is well settled that before a taxpayer can challenge an assessment as discriminatory, he must first exhaust his administrative remedies by making application for a reduction on that ground before the board of equalization. This is because the ultimate determination of discrimination

rests upon a showing of improper valuation of either the taxpayer's property or of other similar property. Since "disputes regarding valuation are within the special competence of the board of equalization"( *Stenocord Corp.* v. *City etc. of San Francisco,* 2 Cal.3d 984, 988 [88 Cal.Rptr. 166, 471 P.2d 966]), the fact that discrimination may ultimately be proved does not dispose of the requirement for an administrative hearing as to the question of value. The Supreme Court said in *Stenocord Corp.* v. *City etc. of San Francisco, supra,* at page 988: "If any question of valuation exists, it would be irrelevant that plaintiff also challenges the assessment as 'arbitrary' or void on constitutional grounds. [Citations.]"

The wisdom of requiring a fact-finding hearing before the board in all cases in which value is an issue is demonstrated by this case. For example, many instances of similarity between appellant's records and of the other kinds of business records mentioned by it are ·manifest. But it is also true that many dissimilarities come to mind, thus raising questions that should be thoroughly explored in the fact-finding forum before discrimination is declared to exist as a matter of law.

█ Appellant contends that it should not be liable for escape assessments for the fiscal years 1965-1968, the three years prior to the first assessment of its title records. Revenue and Taxation Code section 531 provides: "If any property belonging on the local roll has escaped assessment, the assessor shall assess the property on discovery at its value on the lien date for the year for which it escaped assessment. It shall be subject to the tax rate in effect in the year of its escape except as provided in Section 2905 of this code." The language "belonging on the [tax] roll" and "the property on discovery" would seem to refer to property that for some reason was not on the tax roll at the time the assessment was made and was thereafter discovered by the assessor. However, the Supreme Court applied a different interpretation to this language in *De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, 560. The court said, "Only if a delayed assessment were caused by the assessor's negligence and would cause substantial injury to the taxpayer has it been suggested that such assessment may be improper. [Citation.]" This language was approved by the Supreme Court in the case of *Bauer-Schweitzer Malting Co.* v. *City and County of San Francisco* (1973) 8 Cal.3d 942, 947 [106 Cal.Rptr. 643, 506 P.2d 1019]. There is no evidence in the record to indicate either that the assessor was negligent in underassessing appellant's property during the years 1965-1968 or that appellant relied to its detriment on such assessment. Therefore, under the compulsion of the above

cited cases we hold that the back assessments for the years 1965-1968 are valid escape assessments.

The judgment is affirmed.

Gargano, Acting P. J., and Franson, J., concurred.

A petition for a rehearing was denied October 7, 1974, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied November 21, 1974.